**DREWRY v. ARMSTRONG et al.   (No. 7838.)**

(Court of Civil Appeals of Texas. Galveston. April 1, 1920. Rehearing Denied May 6, 1920.)

1. **Wills** ⊚⇒166(5) — **When undue influence presumed from unnatural disposition by testator.**

Where a will makes an unreasonable or unnatural disposition of property, and the testator was so weakened in body and mind as to be easily influenced and the beneficiaries were in position to exercise undue influence, a jury or court would be authorized in finding that such influence was exercised, but where the record shows no such state of facts there can be no such presumption.

2. **Wills** ⊚⇒166(1)—**Evidence held insufficient to show undue influence.**

In a will contest, evidence *held* insufficient to produce even a surmise or suspicion of undue influence by the beneficiaries.

Error from District Court, Galveston County; Robt. G. Street, Judge.

Action by Alice Macgill Drewry against W. T. Armstrong, executor of the last will and testament of Mollie R. Macgill Rosenberg, deceased, and others, to contest the will. Judgment for defendants, and the plaintiff brings error. Affirmed.

D. B. MacInerney, F. S. Anderson and Leo C. Brady (of Fuller & Brady) all of Galveston, for plaintiff in error.

Edw. F. Harris, Mart H. Royston, and Wm. T. Armstrong, all of Galveston, for defendants in error.

PLEASANTS, C. J.  This appeal is from a judgment probating the last will and testament of Mollie R. Macgill Rosenberg, deceased. The grounds upon which the probate of the will was contested were the want of testamentary capacity in the testatrix and the exercise of undue influence upon the mind of the testatrix by Charles P. Macgill and Nellie A. Macgill, who were named beneficiaries in the will. The contestant, Mrs. Alice Macgill Drewry, is a sister and heir at law of the deceased and also one of the beneficiaries named in the will.

The cause was tried with a jury in the court below, but the only issue submitted to the jury by the court was whether the tes-

tatrix was of sound and disposing mind at the time she executed the will. This question was answered by the jury in the affirmative, and upon this verdict judgment was rendered admitting the will to probate. Contestant requested the trial court to also submit to the jury the issue of undue influence, and the sole question presented by this appeal is whether the evidence raised the issue of undue influence as alleged by contestant.

Mrs. Rosenberg died on May 29, 1917, from a disease of the arteries from which she had been suffering for many months. She executed her will on April 9, 1917. The will was written by Mr. W. T. Armstrong in accordance with instructions given him by Mrs. Rosenberg. They were engaged for several days in preparing the will, and there is no evidence that during the time the will was being prepared, or prior thereto, any suggestion was made as to any of the terms of the will by either Charles P. Macgill or Miss Nellie Macgill, nor is there any evidence tending to show that either of them knew what were the intentions or desires of the testatrix in regard to the disposition of her estate.

The legacies bequeathed by the will amounted to approximately ,$250,000, the number of persons named as beneficiaries were 47, 37 of whom were near relatives of Mrs. Rosenberg, sisters, sisters-in-law, brothers, nephews, nieces, great-nephews, and great-nieces. The will gives to each of two sisters, Mrs. Eliza R. Bridges and contestant, and a brother, James Macgill, and sister-in-law, Louisa T. Macgill, $12,000; nieces and nephews are given sums ranging from $2,000 to $6,500, except Charles P. Macgill and Nellie A. Macgill, each of whom are given $60,000. Two sisters-in-law are given $5,000 each. The grandnieces and nephews are given sums ranging from $250 to $1,500. Other bequests to godchildren and friends range in amounts from $500 to $3,000. The estimated value of the estate was $300,000. The residue of the estate was bequeathed to Louisa T. Macgill, a sister-in-law of deceased, contestant, Mrs. Alice Macgill Drewry, Elizabeth R. Bridges, another sister, Nellie A. Macgill, a niece, and Charles P. Macgill, a nephew, share and share alike.

The will upon its face bears evidence of painstaking care on the part of the testatrix to distribute her estate in accordance with her sense of fairness and justice to her relatives, none of whom to the third degree were omitted from its benefactions. In a number of the smaller bequests to grandnieces and nephews the will recites that the bequests are made as tokens of affection, the testatrix being "assured that said beneficiaries are already provided for with this world's goods."

In regard to the legacies to Nellie A. Macgill and Charles P. Macgill, the will recites:

"It is with special affection that I make the bequest herein to my niece, Nellie A. Macgill, and to my nephew, Charles P. Macgill, in recognition in part of the loving attention they have always shown me in sickness and in health."

Mr. Armstrong, who wrote the will, testified as follows in regard to the circumstances and method of its preparation:

"I was at Mrs. Rosenberg's house in April, 1917. I went at the request of a telephone call from Miss Nellie Macgill, and after a little preliminary conversation with Mrs. Rosenberg she told me that she had asked me to come in order that she might prepare her will. I did prepare her will for her in pursuance of her request and at her direction. We began the work, but it was not completed that day. She began by stating, as I say, that she wished me to prepare her will for her. I told her it would be necessary for me to have some paper in order to take down notes that she might give me. * * * She told me if I would raise the lid of the writing desk, or lower it, that I would find some paper in the desk. I opened the desk by her direction and found some paper there. * .* * So I got the paper and told her when she was ready to give me my memorandum I would take it. She then began to tell me and go into detail concerning the family history of her family. She told me she had several brothers * * * who were dead, and that she had one living brother, and that she had, I think, the sisters that are named in the will; and she began, as she went over these names and those family groups, to give me amounts of money that she desired to leave to each one of the persons that she named, and she gave me the names and amounts I put them down on my memorandum sheets. As it developed, there was quite a catalogue of names, as you will see and as you have seen by examination of the will, and when I went to the house it was probably 11 or half past 11 in the morning. It was Monday morning. The will was signed just one week from that date.

"As she proceeded to narrate the history or the names of those brothers and sisters, or their descendants or her relatives, as I say, I took them down, and all that took considerable time because we often diverged and talked about other things, just in a casual natural way, and about half past 1 she said to me—she asked me if I would stay to dinner; that she would be glad to have me, as she would like to talk further with me about the will after dinner. I told her * * * I would be glad to remain if she wanted to talk with me. I told her we could not finish in one day and she might defer it, and she said, 'No,' she 'preferred to talk with me after dinner.' So she asked me to call Miss Nellie Macgill. So I went in the hall and called downstairs for Miss Nellie, and presently she responded and she came in the room and Mrs. Rosenberg told her that she had asked me to dinner and to please set a place for me at the table. There were at dinner, as I recall, Miss Nellie Macgill, Mr. Charles Macgill, the nurse, Miss Piening, and myself. * * *

"After dinner I went again to Mrs. Rosenberg's room * * * and resumed the conver-

sation and the giving of names to me of persons to whom she desired money to be left and as the afternoon progressed * * * I inquired what the value of her estate was and she told me she didn't know exactly, but she guessed perhaps in round figures $250,000; but she suggested that she better be certain about it. She said, 'My estate consists of bonds that are in the South Texas State Bank and of cash that I have in the bank and of the home place,' where she lived. * * * She then asked me to call Charles Macgill. In pursuance to that request I went to the head of the steps and called him, and Miss Nellie responded, and Miss Nellie came up into the room and Mrs. Rosenberg told Miss Nellie to have Charles Macgill come into the room; that she wished to see him. Miss Nellie went downstairs and returned in a few minutes, saying that Charles was not there. She then told Miss Nellie to tell him to come to her room as soon as he came to the house. In the course of a little time, perhaps a half hour, Macgill came to the room and Mrs. Rosenberg told him to go to the bank—the South Texas State Bank—and to ascertain from Mr. Sweet, cashier of the bank, the money she had on deposit in the bank and the value of her securities. Mr. Macgill left in pursuance of those instructions and in the course of a little time returned with a paper memorandum and, as I recall, handed the memorandum to Mrs. Rosenberg, and, as I recall, it showed that she had on deposit in the savings fund of the bank about $40,000 fund drawing interest, and that she had in the checking fund $1,000 or $2,000, and the value of her securities, as Mr. Sweet had given it on the slip of paper as I recall, was about $210,000. So when the memorandum was given to her by Mr. Macgill she told him that that was all that she wanted of him and he immediately left the room. * * * Mr. Charley Macgill was not in the room at any time other than stated by me. Miss Nellie Macgill was not in the room at any time other than stated by me."

In regard to the bequests to Nellie A. Macgill and Charles P. Macgill, he testified that Mrs. Rosenberg said to him:

" 'When you come to write my will, to make a draft of it, I wish you to insert in there a clause stating that I entertain the highest affection for Miss Nellie Macgill; that I am giving her this amount deliberately; that during the years she has known me and I have known her I have formed the conclusion that she is unselfish and self-denying and devoted to me.' And she said, 'I reciprocate the same affection toward her and I wish you when you write my will to make so brief mention of that fact in the will.' "

As to the bequest to Charles P. Macgill, she said:

" 'I give you that amount for Mr. Macgill because I wish to leave it to him.' She says, 'I want as I told you—I want to make Miss Nellie Macgill comfortable, and I desire to also provide in the same way for Charles P. Macgill.' She says, 'I know that he is unselfish; he has been uniformly kind and courteous to me. I have the highest affection for him.' That was

the substance of it—'and I tell you to put that in my will;' and so I did. I concluded the first day's session there."

If the evidence raises the issue of Mrs. Rosenberg's testamentary capacity, and we do not think that it does, that issue is settled by the verdict of the jury, of which no complaint is made.

[1] Charles P. Macgill was partly educated by Mrs. Rosenberg. After his father's second marriage he left his home in Virginia and came to live with Mrs. Rosenberg. This was in February, 1905. He was a member of her family from that time until his marriage in June, 1915. After his marriage he returned to Virginia, where he has since lived. He visited Mrs. Rosenberg in December, 1915, and came again in February, 1917, and remained until April 11th of that year. During this visit to Galveston he did not stay at Mrs. Rosenberg's home, but saw her every day, and as always gave her his affectionate attention.

The evidence leaves no doubt of the fact that the relations between them were affectionate and cordial, but there is nothing in the evidence indicating that he or any one else exercised or held any dominating influence over her. She was a woman of strong character and mentality, and while her long sickness and suffering greatly reduced her strength of body and at times affected her memory and mental powers, she is not shown to have ever lost her will power. During the latter part of her sickness, after the execution of her will, she at times suffered from hallucinations.

Miss Nellie Macgill lives in Virginia. She had visited her aunt here in Galveston several times and often been with her on frequent long visits which Mrs. Rosenberg made to her Virginia relatives. The most affectionate relations were shown to exist between her and Mrs. Rosenberg.

Both Charles P. Macgill and Miss Nellie A. Macgill testified fully and freely as to their relations with Mrs. Rosenberg and their connection with the execution of the will, and each positively denied making any suggestion as to the contents of the will or any knowledge as to what the testatrix intended to give them.

It appears from testimony offered by the contestant that Mrs. Rosenberg had made a previous will, by the terms of which the bulk of her estate would have gone to her brother James Macgill, the father of Charles P. Macgill, and there is testimony to the effect that Charles P. Macgill desired his aunt to write a new will and so advised her after he came from Virginia to see her in February, 1917. Martha Burnett, a servant of Mrs. Rosenberg, testified for the contestant:

"I overheard talk between Charles P. Macgill and Mrs. Rosenberg, in the room where Mrs.

Rosenberg was confined. The talk I have reference to is before Mr. Armstrong came. I was in the adjoining room to Mrs. Rosenberg's room, cleaning up, and I had the windows and doors all open and airing out, so we could take in the next room to clean up in her room. I heard Mr. Macgill say, 'Aunt Moll, you better get your business straight; that will straight;' and she said, 'If anything happened to me your father would get near everything I got.' That was in the afternoon; that was before Mr. Armstrong came, and then in a day or two Mr. Armstrong came. After I last saw Mr. Armstrong at the house I overheard a conversation between Charles P. Macgill and Nellie Macgill. I heard Mr. Macgill tell Miss Nellie at the dinner table when I was carrying meals, 'Well, when Aunt Moll gets her business all straight I am going home.' I overheard that conversation before Mr. Armstrong came. After Mr. Armstrong had been there I heard Mr. Macgill telling out in the kitchen, 'Well, Aunt Moll has got her business all straight now; I am going home; they need me at home.' He told this to Miss Nellie, and to me too, I guess, because I was there. I don't know how long before he left after that statement, but it must have been a day or two; I don't know exactly how long; it wasn't the same day. He returned in about a month, after Mrs. Rosenberg got worse, and he stayed until her death. I remember seeing Mary Drewry at the home of Mrs. Rosenberg; she came after Mrs. Rosenberg got low sick, before she died. I had a conversation with Charles P. Macgill after Mary Drewry came; he told me that Miss Mary was still boss— that Miss Nellie was still boss, and he knew Miss Mary would come here and try to boss things, but not to pay any attention to her; that Miss Nellie was still boss, and we should go by her instructions. Before Miss Nellie came to Mrs. Rosenberg's home Mr. Macgill told me Miss Nellie was coming and told me he thought she would be the best one for me, and that she was a nice girl and we would get along fine; that I would like her. I don't remember the date that Mrs. Rosenberg began to get worse, but I know it was along about the last of—the first of April when she got worse, because Mr. Macgill got Miss Piening there before he left; somewhere along about in April; he said he thought Mrs. Rosenberg ought to have a nurse; he was going home and needed some one there with Miss Nellie. Miss Piening came there before Mr. Armstrong came."

When Charles P. Macgill came to Galveston in February, 1917, two of Mrs. Rosenberg's grandnieces, Misses Bertrand, were with her. They with a sister and their mother, Mrs. Bertrand, had come from Virginia to visit Mrs. Rosenberg and had been at Mrs. Rosenberg's home for a month or more when Charles P. Macgill arrived. A short time before his arrival Mrs. Bertrand and one of the young ladies went to New Orleans, Mrs. Bertrand having some business to transact there. She intended to return to Galveston and remain with her sister while her two daughters visited New Orleans. After Charles P. Macgill arrived Miss Nellie Macgill was telegraphed to come from Virginia to stay with her aunt, and the Misses Bertrand were told by Mrs. Rosenberg that Miss Nellie was coming and that they should write or telegraph their mother that she need not return from New Orleans. This produced some family disturbance, and the result was that Mrs. Bertrand did not return from New Orleans and the two young ladies left Galveston and joined their mother in New Orleans. There is evidence tending to show that Charles P. Macgill, if not primarily responsible, was instrumental in having Miss Nellie come and the Bertrand family leave. The witness Martha Burnett testified as to this circumstance:

"I was acquainted with Miss Austen Bertrand and Miss Mary Bertrand; they were there when I went there; they were there about a couple of weeks while I was there and then left. Directly before they left Mr. Macgill was talking to Mrs. Rosenberg about them; he said it would be best for them to go, because they were worrying her and doing nothing but frolicing around, and he thought it would be best for them to go. After the Bertrand girls left Miss Nellie A. Macgill come to the home of Mrs. Rosenberg. I had a talk with Mr. Charles P. Macgill about Miss Nellie before she came; it was in the morning; she came that afternoon. At the time we had this talk we were in the kitchen; he said: 'Well, I guess you will like the one that is coming now. She is a good old girl. She is coming to take charge of Aunt Mollie's house. I know you and her will get along fine.' "

After the will was executed it was sealed up in an envelope by Mrs. Rosenberg's direction and taken by Charles P. Macgill and deposited in the South Texas State Bank. It was not read by Charles P. Macgill, nor by any one, until it was offered for probate, but Mr. Armstrong told Charles P. Macgill of the bequest made to him and Miss Nellie. Charles P. Macgill gave no information to any of the other beneficiaries in regard to the will.

We think we have stated the substance of all the testimony which could have any possible bearing upon the alleged issue of undue influence, and we agree with the trial judge that the evidence does not raise the issue. It is true that the exercise of undue influence in procuring the execution of a will can rarely, if ever, be shown except by circumstances, and that where the will in question makes an unreasonable or unnatural disposition of the testator's property, and the testator at the time of making the will was so weakened in body and mind as to be easily susceptible of influence exerted by others, and the beneficiaries of such unnatural bequest are shown to have been in position to exercise undue influence, a jury or court would be authorized to find that such in-

fluence was exercised. But no such case is made by the testimony in this record. In the first place, there is nothing unreasonable or unnatural in the disposition made by Mrs. Rosenberg of her estate. It is not unreasonable or unnatural for a testator, in distributing his estate among a number of relatives, to make one a larger bequest than another. The obligation of a testator may be much greater to one relative than another, and the degree of relationship cannot affect this question. The moral and legal right of one in disposing of his property to be influenced by ties of affection and association rather than degree of consanguinity cannot be questioned.

[2] We think the undisputed evidence in this case leaves no room for doubt that the reasons influencing Mrs. Rosenberg in making a larger bequest to Miss Nellie and Charles P. Macgill were those recited in her will and stated to Mr. Armstrong, and that these bequests were not procured by any undue influence exerted on her mind by either of these beneficiaries. While our courts have gone a long way in sustaining the setting aside of wills on the ground of undue influence, no case can be found in which facts no stronger than those shown in this case were held sufficient to raise the issue of undue influence.

It is just as true in a will contest as in any other case that before testimony or a circumstance shown by testimony can rise to the dignity of evidence it must produce more than a mere surmise or suspicion of the existence of the fact sought to be proven. We do not think the testimony in this case justifies even a suspicion that either Charles P. or Miss Nellie Macgill exercised any undue influence in procuring the execution of Mrs. Rosenberg's will. Jones v. Milam, 164 S. W. 859; Beyer v. Le Fevre, 186 U. S. 114, 22 Sup. Ct. 765, 46 L. Ed. 1080; Simon v. Middleton, 51 Tex. Civ. App. 531, 112 S. W. 441; Mills v. Mills, 206 S. W. 100.

The right of a testator to dispose of his estate in a manner consonant with his own conception of obligation and duty and to follow the dictates of his own heart in bestowing his bounty ought not to be interfered with on the ground that he was unduly influenced in making his bequest, except upon evidence reasonably sufficient to justify the conclusion that the testator's expression of his desires as to the disposition of his property was not the expression of his own free will but the will of another wrongfully imposed upon him.

We think the evidence in this case is clearly insufficient to raise the issue of undue influence, and the judgment of the trial court should be affirmed.

Affirmed.