In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00115-CV
______________________________


 
IN THE MATTER OF THE ESTATE
OF GENE E. STEED, DECEASED
 


                                              

On Appeal from the 76th Judicial District Court
Morris County, Texas
Trial Court No. 21631


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Carter


O P I N I O N

            Gene E. Steed, a lawyer, prepared his own will several times. At his death, competing
applications were filed to probate three different wills. His sons originally filed in Ochiltree County
to probate a will dated in 1980. After finding another will on his computer dated in 2001, they filed
the 2001 will. Gene's widow, Shirley Steed, filed in Morris County an application to probate a 1998
holographic will Gene sent her. After venue was set in Morris County, a jury determined that Gene's
holographic will was executed without testamentary intent and as a result of undue influence, and
that the 2001 will was never executed. The trial court found the parties had waived the probate of
the 1980 will and ordered the property distributed by the laws of intestacy. Both the sons and the
widow appeal. The issues are:
            1.         Was Morris County the proper venue?
            2.         Is there legally and factually sufficient evidence to support the jury finding that the
1998 holographic will was executed because of undue influence?
            3.         Is there legally and factually sufficient evidence to support the jury finding that the
1998 holographic will was executed without testamentary intent?
            4.         Is there legally and factually sufficient evidence to support the jury finding that the
2001 will found on the computer was not executed?
            5.         Did the Steed sons waive the probate of the 1980 will?
            We hold that Morris County was the proper venue. We hold that factually insufficient
evidence was presented to support the jury findings (1) that the holographic will was executed as a
result of undue influence; (2) that the holographic will was executed without testamentary intent; and
(3) that the 2001 will was not executed. We further find the 1980 will was not waived. 
1.         Was Morris County the Proper Venue?
            The Steed sons' case was first filed in Ochiltree County, where Gene lived and had practiced
law. Shirley filed the next day in Morris County. The district court in Ochiltree County heard the
motion to transfer venue. The court ordered venue transferred to Morris County. 
            We first address the Steed sons' venue issue, because if venue was improperly transferred
from Ochiltree County to Morris County, the case must be reversed and remanded. See Tex. Civ.
Prac. & Rem. Code Ann. § 15.064(b) (Vernon 2002). Section 6(a) of the Texas Probate Code
provides that wills should be admitted to probate in the county where the deceased resided, if he had
a domicile or fixed place of residence in this State. Tex. Prob. Code Ann. § 6(a) (Vernon 2003). 
We must determine whether the statute establishes venue based on "domicile" or "residence." 
            A person may establish only one domicile, whereas he or she may have several residences. 
Snyder v. Pitts, 150 Tex. 407, 241 S.W.2d 136, 139 (1951). If residence is the test, venue would be
proper in Ochiltree County, where the case was first filed, because it was a residence of Gene. 
However, if domicile is the requirement, venue may be established in only one county. In Snyder,
the Texas Supreme Court reasoned that, in analyzing the general venue statute, the two terms
(residence and domicile) were not synonymous and that it was entirely possible for a person to have
two residences although only one domicile, and provided definitions for each. Id. at 139–40. The
court reasoned that a person had made himself amenable to suit in a particular venue if he had a
residence there, even if his formal domicile was not at that location. That opinion, however, did not
purport to apply that reasoning to the other venue provisions found throughout the statutes, such as
the Texas Probate Code provision that is now before us. An opinion from this Court has explicitly
addressed the question.
            In a venue decision involving the Probate Code, this Court, in Halverson v. Livengood,
4 S.W.2d 588 (Tex. Civ. App.—Texarkana 1928, no writ), acknowledged the presence of the two
terms in the venue provision, but held the Probate Code required venue in the county of the
deceased's domicile. Id. at 591. In construing the probate statute, this Court recognized that statutes
establishing venue against living persons were designed to provide for the convenience of the parties
involved and that, when a person spent so large a portion of his time in a county as to make it a place
of residence, he could not claim that the location was an inconvenient venue for suit. This Court
then discussed the venue statute in probate proceedings, recognizing explicitly that other factors
became more important after the person's death, such as the location of his property and where he
had established a home, which was also typically where most creditors would reside. Based on this
reasoning, the Court concluded there was little reason to give the word "domicile" a meaning
different from its legal significance—"that is, the home or place of permanent residence of the
deceased." Id. This Court interpreted the language in the statute referring to "fixed place of
residence" following the word "domicile" to explain the sense in which the word "domicile" was 
used in the statute and to signify a permanent residence, as distinguished from one which is only
temporary. Id.


 
            The Halverson case, on its facts, is similar to this case. In Halverson, the decedent lived for
many years in Grayson County, but during his latter years, he purchased a home in Dallas County
and lived there with his sister. He also kept a room of a building he owned in Grayson County for
his use. The evidence was conflicting as to his domicile at the time of his death. This Court
remanded the case for a jury determination of the domicile issue. 
            We see no direct conflict between the analysis of the meaning of the two terms made in
Snyder and in Halverson. Indeed, the Snyder opinion cited, with approval, the portion of the
Halverson opinion that discussed the policy reasons for fixing venue in cases involving living
persons and agreed that those policies were not injured by allowing a person to be sued in a county
where he spent "so large a portion of his time as to make that county a place of residence." Snyder,
241 S.W.2d at 142 (quoting Halverson, 4 S.W.2d at 590). 
            We conclude that the precedent of this Court in Halverson should be followed. As set out
in that opinion, because of the different policy considerations involved in probate, as opposed to
general venue issues, we hold that venue is established based on the domicile of the decedent and
that the multiple residence authorization for venue as in Snyder does not apply to the probate venue
statute.


           We now turn to the merits of the domicile determination. 
            The general elements of the legal concept of domicile appear to be treated consistently in all
venue contexts. Those are: 1) an actual residence, and 2) the intent to make it a permanent home. 
The word home has been treated as meaning a "true fixed and permanent home and principal
establishment, and to which, whenever he is absent, he has the intention of returning." Snyder, 241
S.W.2d at 139; see Maddox, 677 S.W.2d at 228 (also recognizing that, when the decedent is in the
process of moving her residence from one county to another, the length of time spent at the new
location is not relevant so long as the act and intention to acquire a domicile coexist). 
Venue Standard of Review
            When examining a venue ruling, we are required to conduct an independent review of the
entire record, including the trial on the merits, to determine whether venue was proper in the ultimate
county of suit. Tex. Civ. Prac. & Rem. Code Ann. § 15.064(b) ("In determining whether venue
was or was not proper, the appellate court shall consider the entire record, including the trial on the
merits."); Ruiz v. Conoco, Inc., 868 S.W.2d 752, 758 (Tex. 1993). We conduct the review like any
other review of a trial court's findings of fact and legal rulings, except that the evidence need not be
reviewed for factual sufficiency. Ruiz, 868 S.W.2d at 758. If there is probative evidence to support
the trial court's determination, even if the preponderance of the evidence is to the contrary, the
appellate court must uphold the trial court's venue determination. Colonial County Mut. Ins. Co. v.
Valdez, 30 S.W.3d 514, 527 (Tex. App.—Corpus Christi 2000, no pet.); see also Ruiz, 868 S.W.2d
at 758. Although we view the record in the light most favorable to the trial court's ruling, we do not
defer to the trial court's application of the law to the facts of the case. See Ruiz, 868 S.W.2d at 758;
N. Natural Gas Co. v. Chisos Joint Venture I, No. 08-03-00075-CV, 2004 WL 1510089, at *3 (Tex.
App.—El Paso July 1, 2004, no pet.).
Analysis—Venue
            In this case, the evidence elicited both at the venue hearing and at the trial showed that this
case was first filed in Perryton in Ochiltree County, where Gene primarily lived and practiced law. 
Gene had lived and worked there during the 1960's. In the mid-1970's, he left and made several
moves to different areas, ending for a short time in Houston. He married Shirley in 1984 and moved
to Perryton, where he reopened his law practice in 1985. 
            Gene lived in what was described as custom-built manufactured housing. Perryton was
shown by his driver's license as his home address, was where he was registered to vote, was where
one (of—arguably—two) homestead exemptions was claimed,


 and was where he ultimately died. 
In 1998, Gene ran for an elective office in Ochiltree County. He spent his weeks there, and
irregularly commuted the 500 miles to Daingerfield to a house on a fifty-acre farm he and Shirley
had purchased and remodeled. 
            Since 1993, Shirley lived exclusively in Daingerfield. In each of several years immediately
before Gene's death, he had spent between twenty-four and thirty-eight days in Morris County—a
maximum of approximately ten percent of his time. There is also some evidence he intended to
eventually retire with Shirley to Morris County. 
            A large portion of Gene's property consisted of ranch land located in West Texas, although
evidently not in Ochiltree County, but in other nearby counties. Gene and Shirley owned three
mobile home parks in East Texas, as well as a farm and house in Morris County.
            The evidence above shows that there was a home located in Morris County at which Gene
spent a portion of his time, that his wife resided there, that Gene had remodeled the home, and that
he purchased fifty acres around the home. Testimony from acquaintances and friends was that Gene
had articulated plans to retire to Daingerfield and make that his home.


 
            The preponderance of the evidence is not the deciding factor for this review on appeal—it
is whether there is any probative evidence to support the trial court's decision. We conclude there
is such evidence, and therefore, we must also conclude the venue ruling must stand. 
            Since we have found Morris County the county of proper venue, we will not address Shirley's
other venue arguments. 
            We now turn to the issues raised by the appellants. Shirley first contends the holographic
will should control because the evidence does not support the jury finding that Gene executed the
holographic will as a result of undue influence. In a related issue, she also contends the evidence
does not support the jury finding that Gene lacked testamentary intent.
Standards of Review—Jury Findings
            Legal and Factual Sufficiency Test When Attacking Party Has the Burden of Proof

            Shirley had the burden to prove the 1998 holographic will was executed with testamentary
intent. She alleges that the evidence supporting the jury finding adverse to her is legally and
factually insufficient. The Steed sons had the burden to prove that the 2001 computer will was
executed. The Steed sons allege the adverse jury finding is without legal and factual evidentiary
support. Therefore, in reviewing those claims, we use the following standards.
            When a party attacks the legal sufficiency of an adverse finding on an issue on which he or 
she has the burden of proof, the party must demonstrate on appeal that the evidence establishes, as
a matter of law, all vital facts in support of the issue. Dow Chem. Co. v. Francis, 46 S.W.3d 237,
241 (Tex. 2001); Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989). In reviewing a
"matter of law" challenge, we must first examine the record for evidence that supports the finding,
while ignoring all evidence to the contrary. Sterner, 767 S.W.2d at 690. If there is no evidence to
support the finding, we then examine the entire record to determine if the contrary proposition is
established as a matter of law. Dow Chem. Co., 46 S.W.3d at 241; Sterner, 767 S.W.2d at 690. We
may sustain the point of error only if the contrary proposition is conclusively established. Croucher
v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983).
            When a party attacks the factual sufficiency of an adverse finding on an issue on which he
or she has the burden of proof, the party must demonstrate that the adverse finding is against the
great weight and preponderance of the evidence. Dow Chem. Co., 46 S.W.3d at 242; Croucher, 660
S.W.2d at 58. We are required to consider and weigh all of the evidence, and we can set aside a
verdict only if the evidence is so weak or if the finding is so against the great weight and
preponderance of the evidence that it is clearly wrong and unjust. Dow Chem. Co., 46 S.W.3d at
242; see Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986). In doing so, we must "detail
the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs
the evidence in support of the verdict." Pool, 715 S.W.2d at 635. 
            Legal and Factual Sufficiency Test When the Other Party Has the Burden of Proof
            Shirley also attacks the legal and factual sufficiency of the jury finding that the 1998
holographic will was executed due to undue influence, an issue on which the Steed sons had the
burden of proof. In that case, in our review of the legal sufficiency, we will first examine the record,
in the light most favorable to the verdict, for any probative evidence to support the finding, ignoring
all contrary evidence. Davis v. City of San Antonio, 752 S.W.2d 518, 522 (Tex. 1988); Larson v.
Cook Consultants, Inc., 690 S.W.2d 567 (Tex. 1985). If there is any evidence of probative value
supporting the finding, then the legal sufficiency argument fails. Holley v. Watts, 629 S.W.2d 694
(Tex. 1982). 
            In reviewing a factual sufficiency challenge in this posture, we must first consider, weigh,
and examine all of the evidence contrary to the jury determination. The finding should be set aside
only if the evidence supporting the jury finding is so weak as to be clearly wrong and manifestly
unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); Wilson v. Goodyear Tire &
Rubber Co., 753 S.W.2d 442, 448 (Tex. App.—Texarkana 1988, writ denied).
2.         Undue Influence
            To justify setting aside a will because of undue influence, a contestant must prove the (1) the
existence and exertion of an influence (2) that subverted or overpowered the mind of the testator at
the time of execution of the instrument (3) so that the testator executed an instrument he or she
would not otherwise have executed but for such influence. Rothermel v. Duncan, 369 S.W.2d 917,
922 (Tex. 1963); Mackie v. McKenzie, 900 S.W.2d 445, 449–50 (Tex. App.—Texarkana 1995, writ
denied). We must begin with the proposition that a person of sound mind has a perfect right to
dispose of his or her property as he or she wishes. Rothermel, 369 S.W.2d at 923. The Rothermel
decision is often quoted for the requirements to prove undue influence: 
Generally, the establishment of the existence of an influence that was undue
is based upon an inquiry as to the nature and type of relationship existing between the
testator, the contestants and the party accused of exerting such influence. The
establishment of the exertion of such influence is generally predicated upon an
inquiry as to the opportunities existing for the exertion of the type of influence or
deception possessed or employed, the circumstances surrounding the drafting and
execution of the testament, the existence of a fraudulent motive, and whether there
has been an habitual subjection of the testator to the control of another. Where there
is competent evidence of the existence and exercise of such influence, the issue as
to whether it was effectually exercised necessarily turns the inquiry and directs it to
the state of the testator's mind at the time of the execution of the testament, since the
question as to whether free agency is overcome by its very nature comprehends such
an investigation. The establishment of the subversion or overpowering of the will of
the testator is generally based upon an inquiry as to the testator's mental or physical
incapacity to resist or the susceptibility of the testator's mind to the type and extent
of the influence exerted. Words and acts of the testator may bear upon his mental
state. Likewise, weakness of mind and body, whether produced by infirmities of age
or by disease or otherwise, may be considered as a material circumstance in
establishing this element of undue influence. Finally, the establishment of the fact
that the testament executed would not have been executed but for such influence is
generally predicated upon a consideration of whether the testament executed is
unnatural in its terms of disposition of property. 

Id. (citations omitted).
            a. The Existence and Exertion of an Influence
            Daniel Hatton, Gene's assistant, testified Gene told him that he prepared the holographic
document to get Shirley off the "warpath" and to pacify his wife and curb her spending because every
time Shirley got mad or upset she would buy something. No issue has been preserved on appeal
concerning the admissibility of these statements. Hatton also testified he overheard conversations
between Gene and Shirley concerning money, that Gene would like to retire and could not afford to
due to her demands. Hatton described the marriage as a love-hate relationship, that Gene was
distraught regarding Shirley's accusations of extramarital affairs, and that he did not want a "nasty
divorce." What is the import of the testimony from Hatton regarding Gene's declarations to him? 
            A will may be invalidated because of undue influence if two factors coalesce: 1) pressure
is brought to bear on the testator by words or acts of a third person (external conduct), and 2) a
collapse of the testator's own will (internal conduct) produced by the pressure. It has been
determined by the Texas Supreme Court that declarations of the testator may be evidence that his
or her will was overcome or collapsed, i.e., the second element, but are no evidence of the first
element—external pressure. Pearce v. Cross, 414 S.W.2d 457, 458 (Tex. 1966). 
            In the Pearce case, the Texas Supreme Court held that the declarations of the testator were
no evidence of an external pressure placed on him, whereas such statements would be some evidence
regarding whether the testator's mind was overcome. In making this decision, the Texas Supreme
Court quoted McCormick & Ray, Texas Law of Evidence, § 894 (2d ed. 1956) concerning an
exception to the hearsay rule and cited Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138 (1914), and
Lindley v. Lindley, 384 S.W.2d 676, 682 (Tex. 1964). In the cases cited by the Texas Supreme
Court, the issue was the admissibility of certain statements of the testator. For instance, in Lindley,
the court said, "These declarations on the part of Mrs. Lindley may be received to show her mental
condition, but they constitute hearsay and have no probative value when offered to prove the truth
of the facts she asserted. See Scott, 166 S.W. 1138; Buchanan v. Davis, 12 S.W.2d 978 (Tex.
Comm'n App. 1929, holding approved); Wigmore on Evidence, 3rd ed. 1940, § 1738." Lindley, 384
S.W.2d at 682. We believe that the import of Pearce was that the testator's statements were
admissible in that case for one issue (state of mind of testator), but not another (exertion of influence
by third person). Since the hearsay statements were inadmissible on the issue of "exertion of
influence," such statements were of no probative value on that issue. 
            However, the Pearce case was decided before the adoption of the Texas Rules of Evidence. 
Before the adoption of the Texas Rules of Evidence, inadmissible hearsay had no probative value. 
Cooper Petroleum Co. v. LaGloria Oil & Gas Co., 436 S.W.2d 889, 891 (Tex. 1969). Rule 802 of
the Texas Rules of Evidence now provides that inadmissible hearsay admitted without objection
shall not be denied probative value merely because it is hearsay. Aatco Transmission Co. v. Hollins,
682 S.W.2d 682 (Tex. App.—Houston [1st Dist.] 1984, no writ). Here, the statements were admitted
without objection and no issue of admissibility is presented in this appeal; therefore, the evidence
cannot be said to have no probative value even if the statements were hearsay. See Tex. R. Evid.
802. Consequently, these declarations from Gene to Hatton will be considered on both components
of undue influence: the external factor (pressure by another party) and the internal factor (collapse
of the testator's mind or will). 
            The statements by Hatton quoting Gene that he executed the will to pacify Shirley and to get
her off the warpath do constitute some evidence of an exertion of influence. Consequently, we will
examine the entire record to determine whether the jury finding on undue influence was clearly
wrong and unjust.
            In looking at the factors used to examine whether an undue influence has been exerted, we
examine several factors. The following factors are concerned with proving the existence and
exertion of an influence over the testator. Rothermel, 369 S.W.2d at 922. 
            1. The nature of the relationship between Gene and Shirley and the other
beneficiaries—Friends of Gene and Shirley and their pastor testified Gene and Shirley had a close,
loving relationship, whereas Hatton perceived it as a love-hate relationship. Van Steed
acknowledged that Gene loved Shirley. Gene wrote a letter to Shirley in September 2001 expressing
his love and affection for her. Shirley moved to Daingerfield in 1993 after she had a heart attack in
order to be near a medical center—Perryton is 120 miles from Amarillo, the nearest city with a major
heart hospital. While it is true they did not live together on a daily basis, they kept in constant
contact by telephone and were together on many weekends. There is evidence that Gene was for
some time estranged from his sons due to a disagreement about a financial transaction. This factor
shows no exertion of influence. 
            2. The opportunity for exertion of undue influence—Since these parties did not live together
daily, there was not nearly as much potential for undue influence. Shirley was 500 miles away from
Gene most of the time. This factor weighs against a showing of the existence of exertion of
influence by Shirley over Gene. 
            3. Circumstances surrounding the drafting of the will—The holographic will indicates that
Gene drafted it "alone." There is no evidence that Shirley was with Gene when he drafted the will
or that she participated in the preparation of the will. There is no evidence Shirley asked, pleaded
with, cajoled, or persuaded Gene to execute the will. According to Shirley, she never asked him
about a will, and at the time he prepared the holographic will, he was in Perryton and she was in
Daingerfield. She received the will in the mail, and Gene told her to put it in the safe-deposit box. 
The evidence concerning this very important factor provides no inkling that Shirley exerted influence
in the preparation of the will. 
            4. Existence of fraudulent motive—Fraud generally refers to some material
misrepresentation. Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc., 960
S.W.2d 41, 47 (Tex. 1998). There is no evidence in the record Shirley misrepresented, deceived,
or tricked Gene in any way. To the contrary, they owned several mobile home parks, one of which
Shirley managed, and they conferred on a regular basis about the businesses. No evidence is
presented of a fraudulent motive.
            5. Whether there has been a habitual subjection of the testator to the control of
another—Gene was a lawyer and businessman who had acquired a sizeable estate. He continued to
be an active practicing lawyer until his death. He was not financially dependent on Shirley. There
was no evidence presented of any other occasions when Shirley controlled Gene's actions. Gene was
described as an independent, opinionated, take-charge type of person. Gene's financial life involved
some significant transactions. The fact Shirley enjoyed spending money is not evidence she
controlled Gene's decisions and actions.
            Other cases provide some guidance. In Griffin v. Griffin, 271 S.W.2d 714 (Tex. Civ.
App.—Texarkana 1954, no writ), the testimony was that the testator's wife dominated him, including
handling all financial matters, being the "boss," and running the whole show. This Court held that
such general and even controlling influence was not sufficient to invalidate the will unless that
influence was specifically exerted on the testamentary act. Id. at 718. This Court found, even in the
face of a jury verdict of undue influence, and considering the evidence in the light most favorable
to upholding the verdict, there was no evidence of probative value to support a finding of undue
influence by the wife. Likewise, in Bradshaw v. Naumann, 528 S.W.2d 869 (Tex. Civ.
App.—Austin 1975, writ dism'd), in construing a deed which a jury found was executed as a result
of undue influence, witnesses quoted the one who executed the deed "as saying that his wife was
running him crazy, that if they had an argument he would give in to her, and that if he had not signed
the deed there would have been hell, '. . . so much hell around there that he'd have to leave home.'" 
Id. at 871. The court held such evidence did not constitute direct evidence of external pressure to
execute the deed. 
            Other than Gene's statements to Hatton, there is no direct evidence of undue pressure by
Shirley toward Gene to make and execute the holographic will. Circumstantial evidence may also
be considered. However, the only circumstantial evidence offered concerned financial matters and
alleged marital infidelity. While this evidence shows discord and disagreements between the
spouses, it must be considered together with all other evidence to determine whether the evidence
is sufficient for a jury to conclude Shirley exerted pressure on Gene to execute the holographic will. 
Indeed, a reasonable conclusion is that such discord would lead to the execution of a will excluding
the offending spouse. The circumstances relied on as establishing the elements of undue influence
must be of a reasonably satisfactory and convincing character, and they must not be equally
consistent with the absence of the exercise of such influence. In re Estate of Graham, 69 S.W.3d
598, 609 (Tex. App.—Corpus Christi 2001, no pet.). This is so because a solemn testament should
not be set aside on a bare suspicion of wrongdoing. Id. (citing Rothermel, 369 S.W.2d at 922). The
evidence discussed above is, under Rothermel, contrary to and greatly outweighs Hatton's testimony
about Gene's declarations to him. For the reasons explained in analyzing those factors, when all the
evidence is considered, we conclude that the jury finding on the first element of undue
influence—the existence and exertion of an influence—is against the great weight and
preponderance of the evidence, and is clearly wrong and unjust. 
            b. Subvert or Overpower Gene's Mind 
            There must also be evidence to support the second element—that the influence operated to
subvert or overpower the person's mind executing the document. Not every influence exerted over
a person is undue. "[O]ne may request or even importune and entreat another to execute a favorable
dispositive instrument, but unless the importunities and entreaties are shown to be so excessive as
to subvert the will of the marker [sic] they will not taint the validity of the instrument with undue
influence." Curry v. Curry, 153 Tex. 421, 428, 270 S.W.2d 208, 212 (1954); Estate of Davis, 920
S.W.2d 463, 466 (Tex. App.—Amarillo 1996, writ denied); Mason v. Mason, 369 S.W.2d 829, 838
(Tex. Civ. App.—Austin 1963, writ ref'd n.r.e.).
            The evidence on which the Steed sons rely for this element consists primarily of the same
relied on for the first element—Gene was trying to find peace of mind, get Shirley off the warpath,
and curb her spending. Additionally, the Steed sons argue that the testimony of Van Steed
corroborates Hatton's testimony. Van testified that it was "true" someone could exert influence over
another even though the distance between them was hundreds of miles, that it was "correct" that
pressure could be exerted by spending thousands of dollars and demanding the other provide the
money, and it was "true" that allegations of sexual improprieties, all together, could overpower a
person's mind. Finally, he was asked, "Do you think that that happened," to which he answered,
"Yes, I do." 
            Again, we find there is some evidence of this element and we examine the factual sufficiency
of the evidence. 
            The element of subverting or overpowering the testator's mind focuses on the mental or
physical incapacity to resist. Rothermel, 369 S.W.2d at 923. These factors are found as follows: 
            1. The state of the testator's mind—Some evidence was presented that Gene had been
prescribed Prozac and suffered from depression and anxiety. However, he apparently worked daily
in his office as a practicing lawyer and businessman. The difficulties he was encountering never
prevented him from conducting his business affairs. By all accounts, Gene was a competent lawyer
and businessman. Witnesses described Gene as "powerful"; competent"; "one of those movers and
shakers that made things happen"; "[h]ad an active, sharp mind"; "as sharp and as bright an
individual as I had known"; "good businessman"; "knew what he was doing"; "strong willed"; "very
opinionated"; "if Gene had his mind made up to do something, . . . you were talking to a wall; it was
just going to be that way." His sons described him as a "take-charge kind of guy"; "headstrong, very
independent"; and "stubborn." This factor militates against a finding that Gene's mind was overcome
or subverted when he executed the will. 
            2. Mental or physical incapacity to resist or the susceptibility of the testator's mind to
influence—There is no evidence Gene was feeble, incapacitated, or financially or emotionally
dependent on Shirley. The evidence was all to the contrary: that Gene was an independent,
opinionated, headstrong person who made his own decisions. 
            3. The words and acts of Gene—Gene stated he had a will and Shirley was the executor. 
Gene also told Hatton that he executed the will to pacify Shirley. As late as April 2001, Gene stated
in a formal financial statement filed with his bank, "I have made a will; the executor is Shirley A.
Steed, my wife." Gene acknowledged he understood that a misrepresentation on the statement was
a criminal offense. He did not give any indication on the financial statement that he considered the
will to be invalid.
            None of the witnesses testified they observed Shirley exert any pressure on Gene to execute
the will. Our review of the entire record reveals that Gene was a meticulous, detail person; that he
worked regularly to the date of his death; and that he was not physically or mentally impaired from
performing his daily tasks. There is no evidence Gene was ever confused about his estate. He
acknowledged that he had a will and that Shirley was the executor. His letters and actions toward
his wife demonstrated a strong bond of love for her. 
            After considering and weighing all of the evidence, we find the second element necessary for
a jury finding of undue influence—an influence overcoming or subverting the testator's mind—is
so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.
            c.         Execution of an Instrument he Would Not Otherwise Have Executed but for Such
Influence 

            The third and final element that must be established to show undue influence is that the
person would not have executed the document but for the influence. Id. at 922. Hatton's statements
regarding Gene's declarations provide some evidence to support the finding, so we will address the
factual sufficiency. The primary proof for this element is that the will is unnatural in its distribution
of the testator's property. Id. 
            Gene's holographic will left his property to his wife and his sons, and was not unnatural. It
is not unnatural when, in distributing property, to make one relative a larger bequest than another. 
Drewry v. Armstrong, 223 S.W. 281 (Tex. Civ. App.—Galveston 1920, writ ref'd). 
            We find there is insufficient evidence to support a finding that Gene would not have executed
the will but for the influence of Shirley, and such finding is clearly wrong and unjust. 
            We sustain Shirley's contention that the jury finding that the 1998 holographic will was
executed as a result of her undue influence is not supported by the evidence and is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. 
3.         Testamentary Intent
            The jury also found that Gene did not have testamentary intent at the time he executed the
holographic will. Shirley had the burden of proof on this issue, and thus must show that the evidence
established the testamentary intent as a matter or law or, alternatively, that the jury finding on the
issue is against the great weight and preponderance of the evidence. 
            A valid will is a document executed with testamentary intent. The sufficiency of the intent
does not depend on the maker's realization that he or she is making a will, or on the maker's
designation of the instrument as a will, but on his or her intention to create a revocable disposition
of the property to take effect after the maker's death. It is essential, however, that the maker shall
have intended to express his or her testamentary wishes in the particular instrument offered for
probate. Hinson v. Hinson, 154 Tex. 561, 280 S.W.2d 731, 735 (1955); Trim v. Daniels, 862 S.W.2d
8, 10 (Tex. App.—Houston [1st Dist.] 1992, writ denied).
            Whether there was testamentary intent on the part of the maker is a proper question in a
proceeding to probate or in a contest of an application to probate. Langehennig v. Hohmann, 139
Tex. 452, 163 S.W.2d 402 (1942); In re Brown's Estate, 507 S.W.2d 801, 803 (Tex. Civ.
App.—Dallas 1974, writ ref'd n.r.e.). An instrument is not a will unless it is executed with
testamentary intent. As described by the Texas Supreme Court, the "animus testandi does not
depend upon the maker's realization that he is making a will, or upon his designation of the
instrument as a will, but upon his intention to create a revocable disposition of his property to take
effect after his death." Hinson, 280 S.W.2d at 733.
Evidence Supporting the Jury's Verdict Finding No Testamentary Intent
            The Steed sons rely on the testimony of Hatton and Van Steed to support the verdict of the
jury. As previously stated, Hatton testified Gene told him he made the will to pacify Shirley and curb
her spending. Van was asked if he thought Gene executed the 1998 document with the intent to
actually distribute his estate and answered, "No, I do not." He was asked, "[D]o you think that he
had testamentary intent when he created that document, . . . ." and answered, "No." Finally, Van
responded he thought his father had ulterior motives in creating the will—which was to appease
Shirley. Further, Hatton said he did not think Gene intended to give effect to that will. Hatton's
testimony concerning Gene's statements constitutes some evidence in support of the jury verdict. 
We therefore will address Shirley's factual sufficiency argument. 
            Our discussion above addresses the only evidence supporting the jury finding—the testimony
of Hatton and Van. Their testimony does not explain the facts and circumstances surrounding the
execution of the will, but is their own opinion as to the thinking of Gene at the time he executed the
will. It is thus extremely weak in a traditional intent review of this type, because intent is to be
determined by the language used in the will—we are to ascertain not what the testator meant to
express apart from the language, but what the words he has used do express. See Ayala v. Martinez,
883 S.W.2d 270, 272 (Tex. App.—Corpus Christi 1994, writ denied) (citing Huffman v. Huffman,
161 Tex. 267, 339 S.W.2d 885, 888 (1960)). In Brown, 507 S.W.2d at 803, the actual words used
by the maker of an instrument are the primary subject of inquiry to resolve the question of
testamentary intent. We now turn to the language of the document itself to determine the purpose
of its making. 
Evidence Supporting Shirley's Argument That Steed had Testamentary Intent
            The language of Gene's holographic will is not ambiguous. Gene was a lawyer, and
apparently a large part of his practice was in the wills and probate field. He had at one time served
as a county judge, which included jurisdiction of wills and probate. The handwritten will is entitled
"Last Will & Testament of Gene E. Steed" and is dated July 4, 1998. The will declares that it is
meant to function as a will and that Gene was of sound mind and disposing memory. He
specifically bequested to Van Steed, Dan Earl Steed, and Randy Gene Steed the surface of all lands
inherited from Van Earl Steed in Gray County in fee simple forever, subject to all debt thereon. He
left to his sons the land in Ochiltree County, specifically naming the lot and blocks. He then left the
residue to his wife, Shirley, and appointed her as independent executrix. Jerry Pratt, an attorney,
testified the will appeared to have been executed by a person with the intent to make a last will and
testament. The words of the will leave no doubt that this was Gene's will and clearly expressed his
intention as to the disposition of his estate on his death.
            Even if a will is doubtful, evidence of the circumstances surrounding the execution of the will
is admissible for the purpose of enabling the court to read the will in light of the circumstances and
discover the meaning attached by the testator to the words used by him or her. Such evidence is
admissible only for the purpose of explaining the meaning of the language, for the intent of a testator
must be ascertained from the meaning of the words used by him or her in the will and from those
words alone. Kennard v. Kennard, 84 S.W.2d 315, 320 (Tex. Civ. App.—Waco 1935, writ dism'd). 
            The testimony of Van and Hatton does not aid the Court in determining, based on the facts
and circumstances surrounding the execution of the will, what the meaning of particular words might
be, but simply attempts to substitute their opinion that, even though Gene clearly expressed his
intention in the will, he did not mean what he clearly expressed. 
Other Considerations
            The Steed sons argue that the evidence supports a finding of lack of testamentary intent based
on Shiels v. Shiels, 109 S.W.2d 1112 (Tex. Civ. App.—Texarkana 1937, no writ). In Shiels, the
testator was to be inducted into a Masonic Lodge office. One requirement of the society was that
he write a will during the ritual. He protested that he did not want to make a will, but was prevailed
on to do so during the induction process. This Court held that the time, place, and circumstances
under which the will was executed were material to determining testamentary intent. In explaining
the rationale, we stated that Shiels protested the making of the will, but then proceeded to prepare
it. We stated that questions remained to be answered: Was his intention to execute the will merely
a part of the ceremony? Did he execute it rather than suffer from dismissal from the class and be
denied further initiation, with the intention that it operate only as a formal compliance with the
requirements of the order? 
            In contrast, here there is no evidence of any unusual or extraordinary circumstances at the
time the will was executed that would raise a question of whether the words of the will were
intended to have some meaning other than as explicitly stated. There is no proof in this case
paralleling the evidence discussed in Shiels about the circumstances surrounding the creation of the
document, but only speculation and presumption about the opinions of two people regarding what
Gene was thinking. 
            Unlike Shiels, this evidence therefore does not support a suggestion Gene did not intend for
this will to operate as a testamentary disposition. As a lawyer, Gene was familiar with the effect of
a document entitled Last Will and Testament which disposed of his property. He had prepared
hundreds of wills in his law practice of over forty-five years. As a practicing wills and probate
lawyer, Gene was fully aware of the consequences and meaning of a will clearly and completely
disposing of his assets "at the time of my death." The words of the will clearly show Gene's intent. 
            The Steed sons also rely on Luker v. Youngmeyer, 36 S.W.3d 628 (Tex. App.—Tyler 2000,
no pet.). In Luker, the decedent had left a handwritten document consisting of three pages. The
document was not signed, but had the name of "Margaret E. Whitely Charitable Trust" on what the
court designated as page A. The court found page A was a separate nontestamentary document
listing changes or potential changes to a trust. The court held that Whiteley did not intend for her
name on page A to express her approval of the testamentary provisions contained on pages B and
C as her will. As such, her name did not constitute her signature, and therefore, the writings were
not a valid will. Id. at 631. That case is clearly distinguishable from this one. 
            Based on our review of the entirety of the record and all of the evidence, for the reasons
explained, the failure to find that Gene executed the will with testamentary intent is so against the
great weight and preponderance of the evidence that it is clearly wrong and unjust. 
4.         The Computer Will
            The Steed sons, in their cross-appeal, contend they proved as a matter of law that the 2001
will found on Gene's computer after his death was executed or that the jury answer finding that it was
not executed was made against the great weight and preponderance of the evidence. Alternatively,
the Steed sons contend the district court erred by determining that, by amending their pleadings to
seek probate of that will, they had waived their right to seek probate of the 1980 will.
            A will was found on Gene's office computer dated November 20, 2001. It was labeled as a
final draft of his will. No signed copy was ever produced. The jury was submitted a series of
questions concerning the execution by Gene of a will on November 20, 2001. The first of these
questions inquired if Gene executed "an instrument which purported to be his last will and
testament" on that date; the jury answered in the negative. Based on that answer, the jury was
instructed not to answer the remaining questions. The remaining questions asked if the will had been
executed with the required formalities, whether it was lost, if the content of the lost will had been
substantially proved, if petitioner's Exhibit No. 5 was an exact copy of the lost will, if a diligent
effort had been made to find it, if the will was last seen in the possession of Gene, if Shirley was
given a duplicate of the will, and if Shirley was last in possession of a duplicate copy. 
            We first look to see if there is any evidence to support the jury finding that no will was
executed by Gene November 20, 2001. It is important to understand that the jury did not answer any
questions concerning the validity of the execution of the will, whether it was lost or if a diligent
effort had been made to find it, or whether the will produced was a true copy of the one Gene
actually executed. The only question the jury answered was—did Gene execute a document which
purported to be his last will and testament. The evidence directly supporting the jury finding that
Gene had not executed the will is that the will produced to the jury was not executed. There was also
evidence that the Steed sons took the computer hard drives from Gene's office and that the drives
were not recovered until several months later.
             Linda James testified she was a document examiner. Her primary testimony concerned her
opinion that the 1998 handwritten will was in Gene's own hand. However, even though she
acknowledged that she was not an expert in the computer field, she testified that, in her opinion, the
November 20, 2001, will was not reliable since it was computer generated and the dates shown for
the creation of the will could be easily changed. She did not, however, examine the computer for a
determination of whether such a date change had in fact occurred. We find some evidence exists to
support the jury finding. 
Was the Evidence of no Execution Factually Sufficient to Support the Verdict
            We now review the entirety of the record and all of the evidence to determine whether the
evidence was factually sufficient. The Steed sons rely on the testimony of the two subscribing
witnesses and the notary public to establish that a will was executed by Gene November 20, 2001. 
            Candice Hague, Gene's former legal secretary, who was not employed by him at the time,
testified Gene called her to come from her home to his office, where she notarized a will after Larry
Money and Hatton signed it as witnesses. She testified that Gene went through the usual procedure,
confirming that it was his will, that he was over eighteen years of age, of sound mind, and that any
other will would be revoked. She testified she did not review the contents of the will and could not
testify that the will produced was the one she had notarized. It also appears that, although her
"notary book" was there, Steed did not sign it on that date. 
            At the deposition, at counsel's request, Hague had accessed the hard drives on the law firm's
computer and found four versions of wills with four time stamps—the last three less than twenty
minutes apart between 8:30 p.m. and 8:46 p.m. November 19, 2001. The one offered was listed in
the computer as "WillGene E Steed final 3." 
            The evidence shows that Hague had filed a sexual harassment claim against Gene after she
quit her job, and that she lost—but it is not clear how long that occurred before the will signing. 
Money worked next door to the law office, and the evidence was that he was often asked to witness
wills. Money testified that he was requested to come to Gene's office to witness his will, that he
heard Gene claim this as his final will, revoking all others, and that Money signed as a witness. He
testified he had not read the will and could not identify the document proffered as the same
document that he signed.
            Hatton, Gene's long-time office assistant, testified Gene asked him to come by on the
morning of November 20 in connection with Gene's will. He testified Gene asked him to read the
will, which he did, and then further testified that the proffered document was an exact copy of the
will Gene signed November 20, 2001, and which Hatton had signed as a subscribing witness. 
            Shirley did not impeach Hatton's testimony about the will. However, she testified that Hatton
had originally come to Gene for legal advice because he had been accused of stealing horses, that
he had told Gene he worked for the Central Intelligence Agency, and that he told her he had nine
college degrees and 233 hours of college credit. She testified that, when she heard Hatton testify in
Perryton, he had stated that he could not remember where he went to college and that he had two
high school degrees, but could not remember where he went to high school. (At this trial, he testified
he did have the college hours, from the Air Force Community College and from a Bible Institute in
Arizona, that he had a GED, and that he had also obtained a diploma after entering the military from
Cooper High School in Abilene.) She testified that Hatton had "street smarts" and that he intrigued
Gene, but that he was not a person Gene would have named as a trustee in his will. 
            The testimony of James concerning the reliability of the computer will was contradicted by
Nickie Drehel, a computer specialist from the Houston Police Department. Drehel testified that it
would be very simple to detect if a computer date had been manipulated and that he had examined
the computer in question and found no such manipulation. 
            When weighing all of the evidence, we find that the two subscribing witnesses testified that
they personally witnessed Gene execute a document and declare to them it was his last will and
testament. Further, the notary public testified she witnessed it and signed and documented the will
in the appropriate places. The contrary evidence is that no executed will was produced, that there
were suggestions Hague would not have been a logical choice to serve as notary since she had
previously filed a sexual harassment charge against Gene, and that Hatton would not be Gene's
reasonable choice for serving as the trustee under the will. The suggestion that the date of the
preparation of the will might have been manipulated was contradicted by an expert witness who had
actually examined the computer. We believe that the relatively uncontradicted direct testimony of
the two subscribing witnesses and the notary public is highly probative and persuasive. This
question is confined to whether Gene executed a will November 20, 2001; it does not deal with any
of the other issues submitted to the jury but not answered. 
            We find that the jury answer is not factually supported by the evidence and that the finding
is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. 
5.         Was the Steed Sons' Attempt to Probate the 1980 Will Waived
            In the alternative, the Steed sons next contend that, if the 1998 will was not valid, the district
court erred by refusing to allow them to pursue probate of the 1980 will. Probate of that will was
sought alternatively in the live pleadings and was presented as an exhibit at the trial. On its face, the
1980 will was executed with all proper formalities and was legitimately self-proven. Thus, the Steed
sons allege that, when the jury failed to find facts sufficient to admit either the holographic 1998 will
or the 2001 will to probate, the 1980 will necessarily remained alive and unrevoked. Since we are
remanding the case for a new trial, we will address this waiver argument. 
            Counsel directs us to nothing in which the trial court declined to permit them to pursue the
probate of the 1980 will either directly or in the alternative. The Steed sons did not present any jury
issues on that will and did not request the district court to take any form of action in connection with
that will. 
            The pleadings directly reference that will and ask that, if the other wills were found to be
invalid, that the 1980 will be probated. Counsel correctly points out that Tex. Prob. Code Ann.
§ 84 (Vernon Supp. 2004–2005) states that, when a will is shown to be self-proven, "no further proof
of its execution . . . required to make it a valid will shall be necessary." The will meets the
requirements of a self-proven will. 
            If resolution of a factual issue is required to establish a theory of recovery or defense, the
failure to request a jury instruction on that issue waives the claim on appeal. Brown v. Bank of
Galveston, Nat'l Ass'n, 963 S.W.2d 511, 515 (Tex. 1998). On the other hand, where no factual issue
is involved and the claim or defense is conclusively established, no request for jury instruction or
submission is required to preserve the issue for appellate review. Chappell Hill Bank v. Lane Bank
Equip. Co., 38 S.W.3d 237, 245 (Tex. App.—Texarkana 2001, pet. denied); Int'l Aircraft Sales, Inc.
v. Betancourt, 582 S.W.2d 632, 636–37 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.). 
            In the final judgment, the district court acknowledged that both wills were before it for
decision. The court then found "that as a matter of law the probate of the 1980 will was waived." 
That statement does not find support in the record. If neither of the prior wills was valid, then
neither could serve to revoke the 1980 will. The record does not show that the Steed sons
affirmatively abandoned that cause of action, and the record does show that the will was before the
court and that it was self-proving, thus requiring no action by a jury to validate it. 
            Under these facts, we conclude that waiver has not been shown and that the district court
erred by so finding. 
            We reverse the judgment of the district court and remand this case for a new trial consistent
with this opinion.
 

                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          October 13, 2004
Date Decided:             December 17, 2004