In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00075-CV


______________________________




ROGER AND LINDA HOOPER, Appellants



V.



BOBBY SMALLWOOD, INDIVIDUALLY AND D/B/A BOBBY 
SMALLWOOD CONSTRUCTION CO., INC., ET AL., Appellees



 


On Appeal from the 62nd Judicial District Court


 Lamar County, Texas


Trial Court No. 74121




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Chief Justice Morriss



O P I N I O N


 The 8,000-square-foot dream home of Roger and Linda Hooper, and the lawsuit that arose
out of the construction of the house, became a nightmare for them, as well as for the builder of the
house, Bobby Smallwood, individually and d/b/a Bobby Smallwood Construction Company, Inc.,
and concrete subcontractor, Robert Skinner. The central question in this case is where the blame
should be placed for the serious physical problems that developed with the house. After a trial in
which a Lamar County jury heard substantially conflicting testimony, the jury lay the blame squarely
at the Hoopers' feet. From the trial court's take-nothing judgment, the Hoopers appeal, raising
multiple, extensive, and passionate arguments to this Court. We affirm the judgment of the trial
court, because we agree with Smallwood's assertions on appeal:

 (1) no error was committed in refusing the requested voir dire of witness Junior Fowler
or in allowing his testimony;

 (2) limiting testimony of expert James Pearson was not error;

 (3) no error was committed relative to breach-of-warranty jury issues;

 (4) legally and factually sufficient evidence supports the jury's verdict;

 (5) limiting post-trial discovery was not an abuse of discretion; and

 (6) refusing a new trial was not an abuse of discretion.

 As in many negligence lawsuits, the central bone of contention is whose behavior caused the
problem at issue. Was the instability in the house's foundation caused by Smallwood's decision to
dig out a "bathtub" in the clay and to fill it with sand, combined with the wide spacing of stiffening
beams (thicker sections) in the foundation? Or, on the other hand, were the problems caused by the
Hoopers' unilateral acts of installing sidewalks around the house, leveling the slope immediately
adjacent to the house, adding so much soil just around the house that it brought the soil level to an
improperly high point on the foundation itself, and/or installing a swimming pool behind the house?

 No dispute exists that the house developed various ailments related to its foundation:
foundation cracks, shifting and lifting walls, cracks in wallboard, and sticking doors and windows. 
After hearing a considerable amount of testimony from a number of different sources, in answering
percentage negligence questions, the jury found that the Hoopers' negligence in making changes to
the area around the foundation was the sole cause of the problems; that Smallwood and Skinner did
not fail to comply with any warranty; that Smallwood did not engage in deceptive acts or practices;
and that the cost of repairs, loss of value, consequential damages, and attorney's fees for the Hoopers'
attorney were all zero. The trial court accordingly rendered a take-nothing judgment in favor of
Smallwood and Skinner.

 Although the Hoopers' brief sets out twenty-one "issues," those issues orbit largely around
two focal points: the witness, Junior Fowler, and the sufficiency of the evidence. We have grouped
the issues for clarity.

 We note that co-defendant Skinner is mentioned only once in the list of issues. Skinner is
mentioned only in connection with an alleged error because the trial court refused to submit a breach
of warranty question naming Skinner. That argument consists of two sentences at the end of the
brief, without discussion or reference to the record or to authority. Because the issue has not been
adequately briefed, we will not address it. See Tex. R. App. P. 38.1(h).

(1) No Error Was Committed in Refusing the Requested Voir Dire of Witness Junior Fowler or
in Allowing His Testimony


 A huge portion of the Hoopers' effort on appeal is about witness Fowler, alleging improper
contacts with him and frauds on the trial court involving him.

 In a rather odd sequence of events, it appears that the Hoopers contacted Fowler (a local
contractor) early on, asking for information about the cost of rebuilding their house. Fowler looked
at the house and gave the Hoopers a generic cost of construction, plus a percentage for everything
involved, due to the increase in materials and transportation costs since the original construction was
completed. Mr. Hooper had one of his employees take that information, calculate amounts, and
place it on one of Fowler's letterheads. That information was provided to Smallwood in discovery,
represented as being Fowler's expert report.

 Before trial, Skinner attempted to depose Fowler. Fowler did not appear. Fowler refused
to return Mr. Hooper's telephone calls or appear pursuant to the Hoopers' subpoena, and ultimately
refused to appear for any depositions whatsoever. Smallwood's trial subpoena succeeded in getting
Fowler to appear at trial. Smallwood called Fowler as a witness. The Hoopers sought to take
Fowler on voir dire: "We filed a motion to hold him in contempt of Court and if we can just take
him on voir dire outside the presence of the jury to figure out what he did to convince him to do what
he did." The trial court denied the request.

 In his testimony, Fowler described the condition of the house and sidewalks and the footprint
of the house. Fowler ultimately opined that the main cause of the damage to the house was the
Hoopers' addition of the sidewalks and flattening of the site. He then testified, quite pointedly, that
he had visited the site only once "thinking I was going to help a friend and also get a job at the same
time, and it was probably to give--it would just be an estimated guess probably, gosh, four or five,
six months ago. I really don't know. I didn't write it down. I didn't document anything on that." 

 Fowler testified that he had never agreed to testify as an expert for the Hoopers, that initially
he had no idea there was a lawsuit pending about the house, and that he told Mr. Hooper, "I'm going
to tell you right now, Bobby Smallwood and I are friends. You are my friend, and I do not want to
get in the middle of this." (1) Fowler also explained how the "report" came into existence. Fowler also
testified that he had no desire to be there, and was there only because he was afraid he would go to
jail if he did not appear in response to a trial subpoena. 

 Although the Hoopers assert error by the trial court in allowing Fowler to testify, the issue
is not addressed by their brief in any detail. The purported error in allowing Fowler's testimony has
not been adequately briefed, and we find nothing compelling that conclusion.

 The Hoopers also complain that they were not allowed to voir dire Fowler, so that they could
explore Fowler's refusal to respond to Mr. Hooper's calls, and his ignoring of a subpoena for a pre-trial deposition. There is no attempt to apply this argument to the case, beyond stating that, under
Rule 705(b) of the Texas Rules of Evidence, it was an abuse of discretion to deny their request to
conduct voir dire. See Tex. R. Evid. 705(b). 

 Rule 705(b) is exclusively directed at allowing voir dire "directed to the underlying facts or
data upon which the opinion is based." That is neither what the Hoopers asked for, nor what they
appear to have wanted then or later. There is nothing in the rule to support that position.

 We find no error regarding witness Fowler.

(2) Limiting Testimony of Expert James Pearson Was Not Error

 The Hoopers also claim that the trial court erred in excluding testimony of appraiser Pearson. 
Pearson had been called by the Hoopers to testify that, because the estimated cost of repairing the
house--that is, repairing the improvements on the land--exceeded the amount reportedly paid to
build the house originally, the improvements currently had no value. After Smallwood's counsel was
allowed to take Pearson on voir dire and the Hoopers' counsel was allowed to make an offer of proof,
the trial court ruled that Pearson's testimony would not be allowed.

 The Hoopers' argument on this point neither made references to the record, nor cited any
authority for the proposition urged. Appellate briefs must contain appropriate citations to authorities
and to the record. Tex. R. App. P. 38.1(h), 38.2(a)(1). An argument may be waived if inadequately
briefed. Fredonia State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284 (Tex. 1994); Gray v.
Nash, 259 S.W.3d 286, 294 (Tex. App.--Fort Worth 2008, pet. denied).

 We also observe that Pearson's testimony involved only issues of damages. Given the jury's
verdict, no damages were recoverable by the Hoopers, making any such testimony on damages
irrelevant.

 We overrule this contention of error.

(3) No Error Was Committed Relative to Breach-of-Warranty Jury Issues

 The Hoopers also argue (with no reference to authority or any legal analysis) that the trial
court erred by submitting a question on whether Smallwood breached express and implied warranties
because the Hoopers established the breaches as a matter of law. An inadequately briefed issue may
be waived on appeal. See Fredonia State Bank, 881 S.W.2d at 284 (discussing "longstanding rule"
that point may be waived due to inadequate briefing). Accordingly, in the absence of authority or
analysis, we will not consider these complaints. Tex. R. App. P. 38.1(h). We also note that, given
the substantially conflicting evidence in the record, no ultimate issue was proven conclusively,
leaving the issues for the jury to decide.

(4) Legally and Factually Sufficient Evidence Supports the Jury's Verdict

 In two variations on a theme, the Hoopers contend that the jury's verdict finding them
negligent is unsupported by sufficient evidence and that they conclusively proved that Smallwood
was negligent. Their argument largely focuses on the causation element of a negligence cause of
action. We initially recognize that the question of the Hoopers' own negligence is not relevant to this
review. The relevant question before us is whether sufficient evidence supports the jury's
conclusion that Smallwood was not negligent. Although the argument is imprecise, it appears the
Hoopers' complaint is that the evidence of proximate cause was lacking, that is, the evidence proves
conclusively that Smallwood and Skinner were the proximate cause of the injury. (2)

 When a party attacks the factual sufficiency of an adverse finding on an issue on which he
or she has the burden of proof, the party must demonstrate that the adverse finding is against the
great weight and preponderance of the evidence. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242
(Tex. 2001); In re Estate of Steed, 152 S.W.3d 797, 806 (Tex. App.--Texarkana 2004, pet. denied).

 In a review of this nature, we are required to consider and weigh all of the evidence, and we
can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight
and preponderance of the evidence that it is clearly wrong and unjust. Steed, 152 S.W.3d at 806; see
also Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986). In conducting our review, we are
mindful that the fact-finder was the sole judge of the credibility of the witnesses and the weight to
be given their testimony. Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). 
We will not pass on the credibility of the witnesses or substitute our judgment for that of the trier
of fact, even if a different answer could be reached. Long v. Long, 196 S.W.3d 460, 464 (Tex.
App.--Dallas 2006, no pet.); In re Estate of Henry, 250 S.W.3d 518, 523 (Tex. App.--Dallas 2008,
no pet.).

 As most recently articulated by the Texas Supreme Court, the test for legal sufficiency is
"whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict
under review." City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). In making this
determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary
evidence unless a reasonable fact-finder could not. Id. So long as the evidence falls within the zone
of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. Id. at
822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their
testimony. Id. at 819. Although we consider the evidence in a light most favorable to the challenged
findings, indulging every reasonable inference that supports them, we may not disregard evidence
that allows only one inference. Id. at 822.

 In determining a no-evidence issue, we are to consider only the evidence and inferences that
tend to support the finding and disregard all evidence and inferences to the contrary. Bradford v.
Vento, 48 S.W.3d 749, 754 (Tex. 2001); Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450
(Tex. 1996). 

 In a factual sufficiency review, we consider and weigh all the evidence and will set aside the
verdict only if the evidence is so weak or the finding is so against the great weight and
preponderance of the evidence that it is clearly wrong and unjust. Vickery v. Vickery, 999 S.W.2d
342, 376 (Tex. 1999); Pool, 715 S.W.2d at 635; Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).

 The elements of a negligence cause of action are a legal duty, a breach of that duty, and
damages proximately caused by the breach. IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v.
Mason, 143 S.W.3d 794, 798 (Tex. 2004) (citing D. Houston, Inc. v. Love, 92 S.W.3d 450, 454 (Tex.
2002)). To establish proximate cause, a plaintiff must prove two elements, cause-in-fact and
foreseeability. Id. Cause-in-fact is established when the act or omission was a substantial factor in
bringing about the injuries, and without it, the harm would not have occurred. Id. at 799; Lear
Siegler, Inc. v. Perez, 819 S.W.2d 470, 472 (Tex. 1991). The jury's negative answer to jury question
number one as to Smallwood and Skinner represented a refusal to find from a preponderance of the
evidence that negligence of either Smallwood or Skinner was a proximate cause of the occurrence. 
See Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989); Hutchison v. Pharris, 158
S.W.3d 554, 564 (Tex. App.--Fort Worth 2005, no pet.).

 The following evidence is not substantially disputed:

 (a) the house is on ground having a fairly substantial slope;

 (b) the builder dug out an area of the clay slope, filled it with sand, and built the Hoopers'
house atop the sand, retaining the slope, which he described as critical to proper
drainage;

 (c) the Hoopers, without consultation with Smallwood, had another contractor build
sidewalks around the house and had at least twenty-one dump truck loads of soil
brought in and placed inside the sidewalk perimeter, effectively leveling the areas in
the front and back of the house; and 

 (d) water collected under the slab causing expansion of the clay subsoil beneath the sand
and resulting in the heaving of the house's foundation.

 Beyond those basics, there was considerable divergence of evidence and opinion. A number
of witnesses provided a number of possible answers to the question of fault. The witnesses'
testimony attempting to assess blame for the movement of the soil and the damage to the house is
all over the map.

 The Hoopers fault Smallwood for providing no expert testimony that would set up a proper
standard of care that Smallwood allegedly met. As the Hoopers were plaintiffs, this is not the proper
view. The Hoopers provided experts that set up a number of inconsistent standards, and then a
number of inconsistent ways in which those varying standards might be met. The problem is not that
there was no evidence of a proper standard of care. The problem is that there were many different
proposed standards of care.

 Smallwood testified that, in his opinion, the collection of water and subsequent heaving of
the soil was because of the Hoopers' flattening of the slope. (3) When the complaints began,
Smallwood offered to remove the sidewalks and restore the slope at no cost to the Hoopers. Mr.
Hooper refused the offer. Instead, Mr. Hooper dug a hole, found no water appeared in it, and
concluded that this proved that the sidewalks and slope were not the source of the problem. The
Hoopers later installed some French drains around the house.

 Donald Illingworth testified that the flat site and later-added fill around the house was the
problem and agreed that the sidewalks should have been taken out and the slope away from the
foundation restored. He also testified that he believed that the beams were too far apart and that
Smallwood should have consulted a soils or structural engineer before preparing the foundation. He
also admitted, however, that foundation problems can exist even with such additional information
and that he had previously written an expert report in a Lamar County case stating that a five-inch
slab with no engineering or soil borings was reasonable for the area. Illingworth also opined that no
fill dirt should have been used and that the slab should have been placed directly on the clay.

 George Perdue did a boring around the house and found water. He also derided the decision
to create a pad for the foundation by digging a hole and putting sand in it, stating that this would
make the soil problems only worse. Perdue disagreed with Illingworth about building on the clay,
and also disagreed with Newton Gorsha's opinion.

 Gorsha, another engineer, testified that the clay beneath the house was shrinking or swelling
because of water, and with no underground source, it would necessarily come from another source. 
He agreed that grading was necessary to help water flow away from the house and that expansive
clay was a problem. He also believed that an engineer should have been hired and that a soils report
should have been obtained before building. He opined that native soil and more fill dirt under the
foundation should have been used.

 Skinner testified that he met with Mr. Hooper and Smallwood in early 2004 and discussed
sidewalks with them. Skinner related that Smallwood wanted them removed, but Mr. Hooper
refused. Skinner testified that the sidewalks were level with the house, and the flower beds were
mounded up in such a fashion that water would run toward the house, with no way to get out. He
also suggested that water is getting in around the perimeter, inside the sidewalks.

 Gary Hilliard, a soils engineer, also testified (by deposition) that Smallwood did not have
enough stiffening in the foundation, that the beams were too far apart, that the digging/sand
combination was a poor way to construct such a house, and that Smallwood should have hired an
engineer. When he was asked to opine that the house was not built in a prudent manner, however,
he refused, stating that the vast majority of houses built in Lamar County use neither soils testing nor
engineers, that nothing about the foundation fell below standards, and that everything done on the
house was within standards. He also acknowledged that "Murphy always rules"--in other words,
sometimes problems occur no matter what precautions are taken. 

 Fred Marshall, the Hoopers' expert for cost of repairs, believed water on the perimeter caused
the problem.

 Jerry Stephens, a concrete construction and foundation repair businessman (with over thirty
years' experience in Lamar County) testified that he went to the house. Stephens testified that he
would not give his usual lifetime warranty for foundation repair if the sidewalks around the Hooper
house were not corrected and that, if he had been allowed to do the work early on, when he first went
out, the cost would have been less. 

 Fowler testified that he saw the water-ponding problem and told Mr. Hooper to take action
to get water away from the foundation.

 John Bryant, Skinner's engineer, testified (by deposition) that he believed water around the
perimeter contributed to the damage and that he assumed drains were put in because the sidewalks
were trapping water. He equivocated at length, testifying that a number of factors could cause water
to be trapped, including the sidewalks.

 James Dawson, the individual overseeing construction projects for a local school district,
noted that, even with soils testing, engineering, and the use of architects, he has still experienced
substantial problems at times. (4)

 In short, we have evidence, expert and otherwise, supporting both sides' positions about the
cause of the problem. The evidence would sufficiently support either jury finding: that the problem
was caused by Smallwood's foundation design or his digging out and putting in sand under the
foundation or that the problem was caused by the Hoopers' addition of sidewalks, removal of the
slope, and/or the additional fill dirt. There is opinion evidence that the design of the foundation was
inadequate and, on the other hand, that the design was standard and adequate for the area. There is
opinion evidence that engineers and soil tests should be used by any competent builder, testimony
that they were not so used in Lamar County, and opinion evidence that, even if they had been used,
they would not necessarily have avoided the problem. (5) There is evidence that Smallwood was a
good and competent builder, with over 700 homes to his credit, and other opinion evidence that he
was not too good or he would have involved engineers and soil testers in the process. The "experts"
variously testified that the water came in from the perimeter around the house, that it did not, and
that an unknown underground aquifer might be causing the problem. Experts opined that, either the
soil should have been simply built on, that too much fill dirt was taken out, that no dirt should have
been taken out, or that different types of fill should have been brought in.

 Clearly, the evidence is in conflict. This Court is not a fact-finder and may not pass on the
credibility of the witnesses or substitute its judgment for that of the trier of fact. Mar. Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998); Bellefonte Underwriters Ins. Co. v. Brown, 704
S.W.2d 742, 744 (Tex. 1986) (findings of fact are exclusive province of jury or trial court). It is not
within the province of this Court to interfere with the fact-finder's resolution of conflicts in the
evidence or to pass on the weight or credibility of the witnesses' testimony. Sw. Airlines Co. v.
Jaeger, 867 S.W.2d 824, 829-30 (Tex. App.--El Paso 1993, writ denied). Where there is
conflicting evidence, the fact-finder's verdict on such matters is generally regarded as conclusive. 
Edmunds v. Sanders, 2 S.W.3d 697, 703 (Tex. App.--El Paso 1999, writ denied); see Pool, 715
S.W.2d at 634.

 There is evidence that would support a rather large number of outcomes in this case. That
being so, we cannot choose one over the other and disregard the jury's resolution of the
disagreements among the witnesses. The jury's verdict was not reached against the great weight and
preponderance of the evidence.

 In related arguments, the Hoopers argue that Smallwood judicially admitted that he was
negligent and that his admission thus conclusively proves his negligence. We have reviewed the
salient testimony. The testimony is not an admission that he was negligent. In context, Smallwood
made an entirely reasonable statement that, if he were building the house now, based on what he now
knows, he would build it differently. In the second referenced statement, Smallwood stated that he
thought he was building the house in a good and workmanlike manner, but apparently did not do so. 
Again, after observing testimony from a host of experts, and then being grilled at some length about
the various problems of the house, and about all of the different ways in which the foundation could
have been built, the response is entirely reasonable and is certainly not a judicial admission of
negligence. 

 The Hoopers further argue, without reference to authority, that the jury's answers to the
question of Smallwood's breach of warranty were unsupportable because the evidence established
conclusively that Smallwood breached his warranty regarding the quality of his construction and the
implied warranty of good workmanship. However, there is evidence, as previously noted, from
multiple sources indicating that Smallwood's workmanship was good and met all standards of the
area and that he did not act in such an unsupportable fashion as would prove breach as a matter of
law.

 The Hoopers conclude that argument by stating in two short paragraphs that Smallwood's
representations were such to require a finding in the Hoopers' favor on their Deceptive Trade
Practices Act claim. This segment likewise has no reference to relevant authority, does not set out
the elements of such a claim, and makes no effort to apply a broad, general statement of the facts of
this case. As noted above, the evidence is in conflict, and even were the briefing sufficient (which
it is not), the argument would fail. These contentions are likewise overruled.

 The Hoopers also complain because the jury answered with zero amounts for both damages
or repair costs and attorney's fees. They argue that the evidence conclusively shows that this cannot
be right. Under our resolution of the remainder of this appeal, we need not address these issues.

 We overrule all contentions asserting the insufficiency of the evidence.

(5) Limiting Post-Trial Discovery Was Not an Abuse of Discretion

 The Hoopers also complain that they were not provided with sufficient post-trial discovery
to allow them to fully develop their theory about fraud and conspiracy. Unlike the situation where
pretrial discovery is involved, there are no clear rules regarding the provision of post-trial discovery
in this context. Generally, the scope of discovery relies on the properly exercised discretion of the
trial court. See In re CSX Corp., 124 S.W.3d 149, 152 (Tex. 2003) (orig. proceeding) (per curiam).

 The Hoopers state they wanted more discovery of communications between counsel and
communications with adjusters, billing records, and additional telephone records. As pointed out
by Smallwood's attorney, parts of that request implicate attorney-client privilege, and counsel flatly
denied that the requested emails existed. There is no articulated reason why additional (presumably
earlier) telephone records would be of assistance to the Hoopers' arguments in favor of a new trial. 
At the hearing on the motion for new trial, the Hoopers introduced Fowler's telephone records from
April 2006 through February 15, 2007; Smallwood's telephone records from December 24, 2006,
through February 23, 2007; and Chadwick's (the attorney's investigator) telephone records from April
2006 through February 15, 2007. The trial was held from February 6 through February 9, 2007.

 Although the Hoopers do not find the quantum of discovery allowed to be sufficient, it is
difficult to conclude the trial court abused its discretion by limiting discovery as it did, and the
Hoopers have provided no rationale suggesting such abuse. We overrule the issue.

(6) Refusing a New Trial Was Not an Abuse of Discretion

 The general rule is that a trial court has wide discretion in ruling on a motion for new trial
and that its action will not be disturbed on appeal absent a showing of an abuse of discretion.
Jackson v. Van Winkle, 660 S.W.2d 807, 809 (Tex. 1983), overruled on other grounds by Moritz v.
Preiss, 121 S.W.3d 715, 721 (Tex. 2003). (6) The trial court does not have unbridled discretion to
decide a motion for new trial, but instead must rely on guiding rules and principles in reaching its
decision. Mosser v. Plano Three Venture, 893 S.W.2d 8, 10 (Tex. App.--Dallas 1994, no writ).

 The Hoopers contend that, at the hearing on their motion for new trial, they showed that fraud
was committed against the trial court by Smallwood and persons related to Smallwood, which
necessarily required or justified granting a new trial. The alleged fraud on the court, the Hoopers
assert, was perpetrated by Smallwood in contacting one of the Hoopers' experts, Fowler, and
convincing him to not return Mr. Hooper's telephone calls, but to testify for Smallwood against the
Hoopers at trial. The Hoopers raised these matters at trial, but had little information to bolster their
position. Before the hearing on the Hoopers' motion for new trial, they obtained discovery about a
number of telephone calls that had been placed between Fowler and Smallwood before trial. The
Hoopers argue now that, based on that information, they proved a conspiracy to commit fraud on the
trial court and, thus, the trial court erred by denying their motion for new trial.

 In extensive and heated arguments, the Hoopers connect the alleged frauds on the court with
asserted improper contacts with Fowler and allegedly resulting false testimony. But the Hoopers'
extensive and energetic efforts to attempt to expose opposing counsel's alleged improper contact with
Fowler is, in the final analysis, "full of sound and fury, [s]ignifying nothing." William
Shakespeare, The Tragedy of Macbeth, act 5, sc. 5. The underlying problem with the Hoopers'
efforts regarding Fowler is that the evidence amply supports, even strongly suggests, the conclusion
that Fowler was not a retained expert for the Hoopers. Unless Fowler was the Hoopers' retained
expert witness, (7) contacts with him by Smallwood's counsel, even if any had been proven, would have
been entirely proper.

 Fowler is a building contractor in the area, and there is evidence that he and Mr. Hooper had
personally met and discussed possible costs to repair the house. However, the only thing provided
by the Hoopers in discovery in connection with Fowler was a list of costs for the various repairs,
which they indicated was Fowler's expert report; yet Fowler unequivocally testified that he had not
prepared a report. Fowler was also clear that he never agreed to be the Hoopers' expert witness. He
maintained all along that he did not wish to be involved in this dispute.

 Second, although the Hoopers complain that Fowler's appearance at trial was a surprise, it
is difficult to give that complaint any credence: he was named as a witness by the Hoopers, as well
as by Skinner.

 Third, there is little that would prevent the opposing party from contacting a named witness,
expert or otherwise, before trial. The only limitation would forbid opposing counsel from contacting
a retained expert witness without permission, which we have already said was not applicable here.

 Fourth, it is obvious that Fowler had no confidential information, that he had no insight into
litigation strategies, or even more than one meeting with Mr. Hooper. There is no confidentiality
agreement, there was no long-standing special relationship, no fee paid, and no attorney work
product involved.

 Fowler's testimony was that, from the very beginning, he had (and articulated that he had)
no desire to be involved in this litigation. Fowler had testified at the trial that he had initially thought
that the Hoopers wanted only some repair work done. He said he had asked the Hoopers if there was
litigation between them and Smallwood and was told there was not. Fowler testified that he never
agreed to be an expert for the Hoopers and was not paid to be one. He indicated that he told the
Hoopers' attorney, when told that they were listing him as an expert, that he would not act as one,
that he did not prepare the report, and that Fowler had initiated contact with Smallwood, not the
other way around. 

 The fact that a witness, even an expert witness, for one side talks willingly to the other side
is not necessarily improper. There are several cases discussing the impact of contact and discussions
between experts for one side and counsel or parties from another. They uniformly find that where
nonretained expert witnesses are concerned, such meetings are not improper. (8) Durst v. Hill Country
Mem'l Hosp., 70 S.W.3d 233 (Tex. App.--San Antonio 2001, no pet.) (defendant's treating physician
meeting alone with plaintiff's counsel not improper, though some worries articulated about possible
revealing of otherwise unrelated and confidential information under doctor-patient privilege); Hogue
v. Kroger Store No. 107, 875 S.W.2d 477 (Tex. App.--Houston [1st Dist.] 1994, writ denied)
(same); cf. In re Collins, 224 S.W.3d 798 (Tex. App.--Tyler 2007, no pet.) (same; but trial court
could issue protective order because doctors might know nonrelevant and privileged facts).

 One recent case from the Corpus Christi Court of Appeals discusses retained experts at some
length in the context of explaining what is required to justify disqualifying one and refusing to permit
him to testify. Formosa Plastics Corp., USA v. Kajima Int'l, Inc., 216 S.W.3d 436 (Tex.
App.--Corpus Christi 2006, pet. denied). It also is not directly on point, as it discusses retained
experts and confidential relationships, caused by providing confidential or privileged information
to the expert by the party. Neither situation exists here. Even in the context of retained experts,
however, the Corpus Christi court recognized that experts should not be too easily disqualified,
because "unscrupulous attorneys may attempt to create relationships with numerous potential experts
at a nominal fee hoping to preempt the ability of their adversaries to obtain expert assistance." Id.
at 448-49.

 The contacts between Fowler and Smallwood have not been shown to be wrongful. There
is no evidence that Fowler changed his testimony because of Smallwood, other than the speculative
and imaginative inferences proposed by counsel for the Hoopers. Further, part of the Hoopers'
argument is based on the underlying notion that opposing counsel was involved in some sort of
collusion and that Fowler was a retained expert with some sort of inside knowledge that was used
by counsel for Smallwood's benefit. No evidence suggests that Fowler was a retained expert, and
both sides acknowledge that Fowler would not even talk to Mr. Hooper. It is thus unlikely that
Fowler had access to any inside or privileged information. Fowler's refusal to appear for depositions
is certainly not laudable--in fact, he was ultimately held in contempt for his failure to appear--but
the evidence suggests that his behavior shows more a desire not to be involved or a disgust with the
entire proceeding than anything else.

 The Hoopers focus on cell phone records indicating that there were twenty-two telephone
calls made between Fowler and Smallwood before trial, and on the content of some of those calls
concerning the "water trapping flower beds" and the creation of a repair estimate. The Hoopers
listed the telephone calls, and provided evidence, at the hearing on the motion for new trial, from the
post-trial deposition of Fowler and a transcription of an interview with Smallwood in which it
appears that Fowler admitted talking to Smallwood about the house, the problems with the house,
and the problems with the drainage. The Hoopers complain that this is different from Fowler's
testimony at trial: that he had only talked to Smallwood three times about the house.

 The testimony, however, is hardly one-sided. There is also evidence that a number of the
twenty-two calls were likely telephone tag which began when Fowler went by Smallwood's office
and asked him to call. According to the process server's affidavit, he called Fowler a number of
times before trial to keep him updated on when trial would eventually begin and when he would
actually need to appear. It seems at least possible that more than three contacts occurred that had at
least some discussion of the house involved. Even multiple contacts, however, are not problematic
under these facts.

 Under this evidence, it is not apparent that the trial court acted outside the scope of its
discretion in denying the motion for new trial.

 Counsel also mentions several other items which appear intended to support his equitable
argument that a new trial should have been granted in the interest of justice. He argues that he
proved that counsel breached his ethical duties because Fowler lied at trial about the number of
contacts he had made with Smallwood or his counsel, James Rodgers, and that Rodgers knew about
the lie and failed to take action to correct it. There was evidence at the hearing on the motion for
new trial to the contrary, and also testimony that, when the process server who had served Fowler
began to tell Rodgers about Fowler's furious tirade after being informed that he was named as a
witness in the case, Rodgers told Jim Chadwick that he wanted to hear nothing about what Fowler
had to say except from the stand. 

 Counsel for the Hoopers complains because the process server (Chadwick) used by Rodgers
talked to Fowler repeatedly before trial. Chadwick is married to Smallwood's daughter. Again, as
previously discussed, Fowler was not a retained expert. If Fowler was willing to talk, there was no
ethical or legal impediment to keep an investigator from talking to him.

 Counsel for the Hoopers complains about Rodgers' leading questioning of Fowler, but
provides no real argument. It appears that counsel is attempting to use that as some sort of support
for his main complaint, that Rodgers necessarily knew what Fowler was going to testify to and was
having to lead him into it.

 The Hoopers also suggest that counsel for Skinner, Jerry Ewing, acted in a manner that
supported the conspiracy because he opposed post-trial discovery. In fact, the trial court twice
quashed a subpoena and refused to "produce documents indicating the nature of the Fowler
conspiracy." Ewing was questioned at the hearing, but his statements were innocuous.

 Counsel for the Hoopers also complains that, during a break in Fowler's cross-examination
at trial, Rodgers pulled Fowler aside and talked to him. The record shows counsel questioning
Fowler about this, with the following exchange:

 Q. . . . During the break from 10:00 to 10:20 - excuse me 10:20 to 10:22 you
talked to Mr. Rodgers?


 A. Right.


 Q. What did you talk about?


 A. What did I talk about?


 Q. Yes, sir.


 A. He was kind of concerned about you were [sic] trying to make me say that they
[Smallwood] had contacted me. I haven't talked to any of these people.


There was no other discussion, no complaint raised, counsel merely continued on with his
questioning. Neither error nor harm is shown, and counsel's attempts to show the existence of a
conspiracy from such slender comments is at the very least imaginative.

 The Hoopers also complain because their witness (who they did not call) was called to testify
by Smallwood without prior warning. They seem to argue that this is inappropriate because the
parties had agreed to tell each other who they were going to call and the sequence on the day before
each was called to testify. However, Smallwood has directed us to direct statements by the Hoopers'
counsel that, although the trial court had asked them to reach such an agreement, they had not.

 The Hoopers also complain that Smallwood had not identified Fowler as a trial witness as
required by an interrogatory. However, it appears that Skinner had done so, and had the Hoopers'
counsel complained about this failure in a timely fashion, the witness could still have been brought
because of Skinner's designation. 

 Nothing shows any impropriety by Rodgers. We are not convinced, either by the arguments
raised nor by the large number of unrelated comments made by counsel for the Hoopers, that the trial
court abused its discretion by denying the motion for new trial. The contention of error is overruled.






 We affirm the judgment.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: August 13, 2008

Date Decided: October 22, 2008


1. Fowler testified that he threw the subpoena into his fireplace and burned it and that he did
call Smallwood to tell him that he was not going to appear.
2. The Hoopers also argue, in this context, that there was no evidence that they were
responsible for the way in which the sidewalks and soil were installed. It is clear that they paid for
the work and that they hired others to perform the job they laid out for them to do. For the Hoopers
to now claim that they had no responsibility because someone else did as they directed is
insupportable. Further, if they wished to claim that some other party followed their directions in a
negligent manner, it was their responsibility to bring them into the suit as parties and attempt to
recover from them. The Hoopers now state flatly in their appellate brief that the "independent
contractor" was negligent. That argument is raised too late to be considered.
3. We recognize that the Hoopers now complain that Smallwood's testimony should be
disregarded because he was not named as an expert witness. However, he was able to testify, and
did so without objection. Any complaint about the nature of his testimony has not been preserved
for our review. See Tex. R. App. P. 33.1.
4. The Hoopers argue that this witness' testimony should be disregarded as without any weight,
because he is not an expert builder and works with a school district. It is, however, apparent from
his testimony that the witness has expertise in connection with the construction of large buildings
in the area. He is hardly inherently unbelievable as counsel suggests, and any weakness in his
credentials or testimony will go to the weight of his testimony and credibility--matters exclusively
for the determination of the jury. 
5. The Hoopers also argue that there is no expert testimony that supports the jury's conclusion
that the Hoopers were negligent. That particular argument is immaterial, as the question is whether
Smallwood was negligent, and whether the finding that he was not is against the great weight and
preponderance of the evidence.
6. Similarly, if we classify this as involving newly discovered evidence, the standard for our
review is the same: we also review a trial court's ruling on a motion for new trial based on newly
discovered evidence for an abuse of discretion. Mitchell v. Bank of Am., N.A., 156 S.W.3d 622, 629
(Tex. App.--Dallas 2004, pet. denied). A party seeking a new trial on the ground of newly
discovered evidence must show the trial court that (1) the evidence has come to his or her knowledge
since the trial, (2) it was not owing to the want of due diligence that it did not come sooner, (3) it is
not cumulative, and (4) it is so material that it would probably produce a different result if a new trial
were granted. Wheeler v. Greene, 194 S.W.3d 1, 6 (Tex. App.--Tyler 2006, no pet.); Fantasy Ranch,
Inc. v. City of Arlington, 193 S.W.3d 605, 615 (Tex. App.--Fort Worth 2006, pet. denied); see
Dallas Indep. Sch. Dist. v. Finlan, 27 S.W.3d 220, 240 (Tex. App.--Dallas 2000, pet. denied),
(citing Jackson, 660 S.W.2d at 809).
7. The word "retain" is defined in relevant part as "to keep in one's pay or service . . . to employ
by paying a retainer." Merriam-Webster's Collegiate Dictionary 1063 (11th ed. 2006).
8. This is readily distinguishable from the wrongdoing described in Rule 4.02(b) of the Rules
of Professional Conduct, which provides that "a lawyer shall not, personally or by representative,
cause another to communicate about the subject of representation with a person . . . a lawyer knows
to be employed or retained for the purpose of conferring with or advising another lawyer about the
subject of the representation, unless the lawyer has the consent of the other lawyer or is authorized
by law to do so." Tex. Disciplinary R. Prof'l Conduct 4.02(b) (emphasis added).