

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00029-CV
_____

IN RE:  THE ESTATE OF JAMES W. FISHER, DECEASED

On Appeal from the County Court at Law
Harrison County, Texas
Trial Court No. 2011-16,479-CCL

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

In the spring of 2011, in his early nineties and less than five months before his death, James W. Fisher[1] executed a will that favored his nephew, James Umberger, over his surviving lineal descendants, Sheila Nikko Fisher and Carlos Garcia, III,[2] who had been favored in a purported will dated in 2004.[3] In this will contest, Sheila and Carlos opposed the probate of the 2011 will and offered the purportedly lost 2004 will. The question before us today is whether a significant set of suspicious circumstances establishes a fact question of whether a will was executed under undue influence. Because binding legal authority leads us to the conclusion that the evidence in this record does not set up a fact question concerning undue influence, we affirm the trial court's summary judgment favoring James and the challenged will.

Sheila and Carlos asserted that the 2011 will was the result of James' undue influence. To demonstrate the contents of the lost 2004 will, Sheila and Carlos attached the will of Fisher's pre-deceased wife, Audrey May Fisher, and swore that the contents of the lost will were identical to the contents of Audrey's will "except for the interchange of the names 'James W. Fisher' and 'Audrey May Fisher.'" Sheila and Carlos further swore that the lost will "was maintained in

---

[1]We will refer to the decedent as Fisher and all the other individuals by their first names in an attempt at clarity. The party, Carlos Garcia, III, will be called Carlos. Carlos' father, Carlos Garcia, Jr., is referred to by our use of the pseudonym Chester Garcia (Chester), all to try to avoid confusion.

[2]The 2011 will made specific gifts of $5,000.00 to Shelia, Carlos, and others, named James as independent executor, and bequeathed to James the residue of the estate. Sheila and Carlos are the natural grandchildren of Fisher. Sheila had also been adopted as Fisher's daughter.

[3]The purported 2004 will would have left Fisher's estate to his daughter, Jacqueline Garcia, now deceased, who is Sheila and Carlos' biological mother, or to Jacqueline's living issue if she predeceased Fisher. That would have effectively put the residuary estate in Sheila and Carlos.

[Fisher]'s safety deposit box at Regions Bank . . . [but] that James Umberger, and others, had access to the safety deposit box and motive to remove or destroy the lost Will."

James filed a no-evidence motion for summary judgment asserting that there was no evidence that the 2011 will was executed as a result of undue influence. The trial court agreed, granted James' no-evidence motion for summary judgment, admitted the 2011 will to probate, and issued letters testamentary to James.

In a will contest, as in any other case, we review de novo a trial court's summary judgment. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *see Estate of Davis v. Cook*, 9 S.W.3d 288, 292 (Tex. App.—San Antonio 1999, no pet.). Once a movant alleges that there is no evidence of one or more specified elements of a claim or defense of which the nonmovant would have the burden of proof at trial, the burden shifts to the nonmoving party to present evidence raising a genuine issue of material fact as to the element or elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006); *see* TEX. R. CIV. P. 166a(i); *Galindo v. Snoddy*, 415 S.W.3d 905, 911 (Tex. App.—Texarkana 2013, no pet.). A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id*. On the other hand, the evidence amounts to no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" of fact. *Id*. When determining if more than a scintilla of evidence

3

has been produced, the evidence must be viewed in the light most favorable to the nonmovant. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

To justify setting aside a will because of undue influence, a contestant must prove "(1) the existence and exertion of an influence (2) that subverted or overpowered the mind of the testator at the time of execution of the instrument (3) so that the testator executed an instrument he or she would not otherwise have executed but for such influence." *In re Estate of Steed*, 152 S.W.3d 797, 807 (Tex. App.—Texarkana 2004, pet. denied) (citing *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *Mackie v. McKenzie*, 900 S.W.2d 445, 449–50 (Tex. App.—Texarkana 1995, writ denied)). Here, Sheila and Carlos bore the burden of proving undue influence at trial and were required to "introduce some tangible and satisfactory proof of the existence of each of the above[-]stated elements of undue influence" to survive James' no-evidence challenge. *See Rotherme v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963).

Topics relevant to the analysis of whether a will should be set aside due to undue influence include: the relationship existing between the testator and the parties, the opportunities for an exertion or deception, the words or acts of the parties, the mental or physical incapacity to resist or susceptibility to influence, the circumstances surrounding the drafting and execution of the will, the existence of a fraudulent motive, and any domination or habitual control of the testator by another. *In re Estate of Reno*, No. 06-09-00040-CV, 2009 WL 4877542, at *5 (Tex. App.—Texarkana Dec. 18, 2009, no pet.) (mem. op.) (citing *Rothermel*, 369 S.W.2d at 923). We examine each of those topics.

4

*(a)     The Relationship Existing Between the Testator and the Parties*

Although Sheila was born to Jacqueline, Sheila lived with Fisher and Audrey in Alexandria, Louisiana, and was later adopted by them. Fisher and Audrey moved to Hallsville, Texas, when Sheila was eleven or twelve years old so that she could live next door to Jacqueline, Jacqueline's husband, Chester, and their child, Carlos. Sheila moved away to Dallas in 2002. Carlos became a Specialist, E-4-ranked Military Police Officer who traveled frequently as a result of his deployment from 2005 to 2011 and returned home rarely.

From time to time, Fisher and Audrey were visited by James and his wife. Sheila testified that Fisher and James bonded because both had served in the military, but it appeared that Audrey was not as impressed with James. Carlos testified that Audrey did not like James and his wife and told Carlos that "every time they came around, [Fisher] acted like a[n] ass." As an example, Carlos testified, James and his wife "went one time and took a trip to . . . Hawaii. [Fisher] insisted they would go. And all it did was make [Audrey] hate them even more." In addition to travelling to Hawaii together, Fisher and Audrey also vacationed with James and his wife to Navy reunions.

Fisher and Audrey both suffered from physical ailments. Sheila and Carlos testified that, in their absence, Jacqueline took care of Fisher and Audrey by cooking for them, taking them to doctors' appointments, reminding them to take their medications, and paying their bills.[4]

---

[4]According to Carlos, Fisher had given a power of attorney to Jacqueline in 2007 or 2008.

Nevertheless, according to Sheila, Fisher and Audrey were fairly independent until Audrey sustained a fall in 2009 and fell ill.[5] Audrey died June 6, 2010.

*(b)      The Opportunities for Exertion of Influence or Deception*

James, who lived in New Hampshire, came to Texas to attend Audrey's funeral and to spend time with Fisher, who was understandably depressed. According to Sheila and Carlos, James appeared to show more interest in Fisher's affairs than he had previously. James and Chester went shopping for a recliner for Fisher shortly after Audrey's death. Chester's affidavit stated that James "took the credit card from me and processed the transaction." According to Chester, when he asked for the receipt, James responded, "'What the hell do you need it for[?]'" Chester answered, "'Because my wife keeps the books,'" to which James remarked, "'Not for long.'"

After Audrey's funeral, James asked Fisher if he wanted to travel back to New Hampshire with him, and Fisher agreed. Sheila testified that the purpose of the New Hampshire trip was, in part, so that Fisher could deliver a speech at another Navy reunion. According to Sheila, Jacqueline typed the speech, planned the trip for Fisher, packed his clothes, and gave him cash for the vacation. Carlos was granted military leave to visit, but was unable to attend Audrey's funeral. When he arrived in Texas, Carlos discovered that Fisher had already left for New Hampshire and assumed that Fisher might have agreed to take the trip only because he could not refuse James' offer since James outranked him in the military. Meanwhile, Jacqueline made the decision around this time to remodel Fisher's home so that Carlos and his family could

---

[5]Sheila testified that she visited Audrey "almost every weekend" that she was in hospice care.

move into it in case he was granted an honorable discharge sometime in the near future.[6] Because the trip to New Hampshire lasted for approximately one month, Carlos was unable to see Fisher before his military leave ended. Sheila and Carlos believed that James had an opportunity to exert an influence on Fisher during the New Hampshire trip.[7]

*(c)     The Words or Acts of the Parties*

When Fisher returned from New Hampshire, James began calling Fisher more frequently.[8] According to Carlos, Fisher told Jacqueline, "[James] keeps call[ing] me every day, Jac. He won't leave me alone about the Will; he wants the paperwork and all this stuff and this is what's going on." Sheila was told that James was calling Fisher "at least maybe every three days or so, asking about [Audrey's] insurance policies, [and things of] that nature." James testified that, in July or August 2010, he accompanied Fisher to attorney Brad Echol's office to facilitate the probate of Audrey's will.[9] According to Chester, Fisher opened a new checking account at Regions Bank in early 2011, named James as co-owner of the new account, and transferred a large amount of money from his regular checking account into the new account. Chester claimed that Jacqueline became aware of the new account when checks drafted on the checking account began bouncing. Chester's affidavit recited,

---

[6]According to Carlos, Jacqueline decided to redo the plumbing and install hardwood floors and new windows.

[7]Sheila testified that, although Jacqueline set up the arrangements for the trip, Fisher "got put on the wrong plane and he didn't know how to get home . . . he didn't know where he was . . . ." She believed that Jacqueline was required to purchase a new plane ticket for Fisher so that he could return to Texas.

[8]James' telephone records showed that he spoke to Fisher several times in February and March 2010, and began speaking with Fisher regularly as of August 2010.

[9]Echols also billed Fisher for a telephone conference that he had with Jacqueline.

> [Jacqueline] talked to [Fisher] and then called [James] to find out what was going on. I overheard the entire conversation, because J.W. Fisher's telephone is connected to the stereo speakers so that he can hear. [Jacqueline] was angry, and they began to argue. She said, "But he's my Dad." [James] said, "It doesn't matter who you are, I can make him do things you can't."

On January 1, 2010, James was added as a co-owner with right of survivorship to Fisher's bank safety deposit box. Sheila testified that Fisher told Chester about "changing the bank records and things to that effect" and that Jacqueline became "really upset" when she discovered what had happened. According to Sheila, Jacqueline, who had managed Fisher's financial affairs for many years, "died of a broken heart" February 8, 2011. Carlos was granted leave to return for Jacqueline's funeral and saw Fisher for the last time. Sheila testified that she visited Fisher "maybe every other weekend, every three weeks."

*(d)     Mental or Physical Incapacity to Resist or Susceptibility to Influence*

To Sheila and Carlos, it appeared that Fisher's judgment was being influenced by James because of Fisher's physical and mental state. As evidence of Fisher's impairment, Carlos testified that Fisher could not walk from the house to his mailbox, and Sheila and Carlos both testified that Fisher would get lost while driving. Carlos also believed that Fisher was losing his memory and, around February or March 2011, could not even remember that Audrey and Jacqueline had died.[10] Sheila testified that Fisher was almost blind and deaf and that he sometimes called her Jacqueline by accident. Sheila and Carlos both believed that Fisher was

---

[10]Carlos also testified that Fisher had heart problems and that any heart condition would render a person incapacitated to execute any legal document.

diagnosed with dementia and Alzheimer's, although neither had produced medical records listing such a diagnosis.

Carlos testified that, during one telephone conversation which he overheard, James asked Fisher if anything needed to be done with respect to his testamentary disposition since Jacqueline had died, and Fisher replied "[N]o, there's no reason. Everything is going to my grandkids." Chester claimed that Fisher told him, "Jim is pushing me to change the will; he's pushing me to do something I don't want to do."

After Jacqueline's death, Fisher continued to live alone with the assistance of his long-time neighbors, James and Linda Crowley, who were hired to care for Fisher, provide him with transportation, and pay his bills.[11] On March 28, 2011, Fisher had an out-patient appointment at the VA medical center in Shreveport, Louisiana. The medical records from that appointment, which listed the Crowleys as Fisher's caregivers, reflected that Fisher had and took medication for a variety of physical ailments, including nerve damage causing "burning in feet," backache, high blood pressure, high cholesterol, gout, enlarged prostate, and allergies. Additionally, Fisher had a "mild to moderately impaired ability to hear" and could not "see medication labels or newsprint, but [could] see obstacles in [his] path, and the surrounding layout" and could read very large print or regular print using a magnifying glass.

As for his mental status, the March 28, 2011, medical records showed that Fisher (1) suffered from depression, labeled as "appropriate grief," (2) had a "[r]ecent decline in mental, emotional, or behavioral status," (3) was experiencing anxiety, (4) "underst[ood] most

---

[11]Carlos testified that Fisher reported that James was paying the Crowleys "[t]o make sure that everything was done the way he wanted it."

conversations, but misse[d] some part[s] [or the] intent of [the] message [and] [r]equire[d] cues at times to understand." Also, although Fisher took "extra time [and made] occasional errors in word choice, grammar[,] or speech intelligibility," he had "[m]inimal difficulty in expressing ideas and needs" with "minimal prompting or assistance." On March 29, 2011, Fisher filled out an intake form for the Cypress Home Health Agency. A depression screening revealed that Fisher was not depressed and did not suffer from cognitive, behavioral, or psychiatric issues. Further, there was no medical diagnosis of mental impairment.

*(e)      The Circumstances Surrounding the Drafting and Execution of the Will*

According to Sheila, Fisher told Chester about "putting [James] over his estate." Sheila testified that the Crowleys took Fisher to Echols' office to execute the 2011 will March 30. The will was prepared by Echols, contained a self-proving affidavit, was witnessed by third parties, Hannah William and Carla Parks, and was notarized by Debbie Batchelor. Sheila testified that the signature on the 2011 will appeared to be Fisher's signature. However, Sheila and Carlos pointed out that the will inaccurately listed "Marie C. Cultress" as Fisher's daughter instead of Audrey's daughter from another marriage.[12] James denied any involvement in the making of the 2011 will, and it was undisputed that he was at his home in Kearsarge, New Hampshire, on the date that it was executed. James testified that he was unaware that he would be named as

---

[12]Fisher's will listed "Robert W. Finical" as his grandson. The transcript from Carlos' deposition refers to "Bobby Finnacle[] (spelled phonetically)" instead of Robert W. Finical. Sheila and Carlos' appellate brief cites to this portion of Carlos' transcript for the contention that Robert's name was misspelled in the 2011 will and, thus, that someone else might have drafted the will or that Fisher was not fully aware of what he was signing. However, it is well known that Bobby is a common nickname for Robert, and the transcript of Carlos' deposition clearly indicates that the reporter was spelling Finical's name phonetically. Because the court reporter also spelled Marie's last name as "Coultress" instead of "Cultress," Sheila and Carlos argue that "the name Coultress is misspelled throughout the" 2011 will. Presumably, the argument related to misspellings was made because Sheila and Carlos had the opportunity to correct, but did not correct, misspellings made in the deposition transcripts. Nevertheless, no one testified that the will contained misspellings of the names of family members.

independent executor of Fisher's estate or that the residue of the estate would be left to him. The Crowleys mailed a copy of the 2011 will to James.

*(f)    Fraudulent Motive or Domination*

On the same day that the 2011 will was executed, James was added as a beneficiary on Fisher's life insurance policies. In March–April 2011, Fisher executed documents giving James a power of attorney and medical power of attorney. James testified that Fisher asked him to visit in April 2011 and discussed his testamentary wishes with him during the visit. On April 19, 2011, James and Fisher placed the 2011 will in the co-owned bank safety deposit box that was opened in January. On April 27, James was added as co-owner with right of survivorship on Fisher's checking account and on two certificates of deposit. On July 27, 2011, James was added as a co-owner with right of survivorship to Fisher's savings account.

Fisher died August 21, 2011. James testified that he retrieved Fisher's jewelry, coin collection, and cash from Fisher's home and deposited the items into the co-owned safety deposit box. He also took the 2011 will to Echols' office.

Sheila and Carlos testified that they did not know who scheduled Fisher's appointment with Echols and had no evidence that James aided Fisher in drafting the 2011 will. Sheila further testified that she had no personal knowledge of any events of undue influence precipitated by James. Nevertheless, they both believed that James must have unduly influenced Fisher to draft the 2011 will due to the will's disposition. They hired David Sorrel Wachtel, a doctor of clinical psychology, to provide his professional opinion on whether Fisher had been unduly influenced.

11

Wachtel issued an expert report after interviewing Carlos and reviewing documents including the 2011 will, Fisher's hospice records, Sheila's and Carlos' depositions, some of the pleadings in the case, family photographs, a family history diagram, commentary from the Texas Probate Code discussing the elements of undue influence, and a timeline of events provided by Sheila and Carlos.[13] Wachtel's report stated,

> It is my professional opinion that Mr. Fisher's emotional and mental state had been profoundly impaired from at least 2006, and was markedly exacerbated following the deaths of his wife in 2010 and his daughter [Jacqueline] in 2011. Consequently, he was extremely vulnerable and highly susceptible to undue influence, including having his mind and judgment easily subverted and overpowered (particularly by his nephew, [James], to whom Mr. Fisher would respond as a military superior). Further, it is my opinion that the nature, duration, and severity of Mr. Fisher's emotional and mental impairments did exist during the period from June 2010 until his death in 2011 such that any actions he engaged in during this period -- including revising his 2004 will -- could not reflect independent and appropriate reasoning and decision-making.

Wachtel testified that no one in Fisher's state who had suffered the death of a wife and child would be able to make a change in testamentary disposition because "no one emotionally would be able to be in a position to make good-decision making . . . [with] the amount of trauma . . . in addition to the multiple medical problems and other cognitive impairments."[14]

During his deposition, Wachtel admitted that he had never conducted an initial evaluation of the mental state of a deceased person and had never been employed to provide an expert opinion on whether someone had been unduly influenced to execute a testamentary or non-

---

[13]Wachtel testified that it would have been helpful to review James' deposition testimony but that he was not aware James' deposition had taken place since it had not been provided.

[14]Although there were no medical records supporting a diagnosis of post-traumatic stress disorder, Wachtel believed that Fisher suffered from it.

testamentary disposition.[15]  Wachtel testified that he had no direct evidence that James unduly influenced Fisher on the day the will was executed, although he believed James had exerted pressure on Fisher over a period of time based on Sheila's and Carlos' depositions.[16]

In granting James' motion for summary judgment, admitting the 2011 will to probate, and issuing letters testamentary to James, the trial court found that there was no evidence that the 2011 will was the result of undue influence exerted by James on Fisher.

*(g)      Analysis*

"Undue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence or power." *Rothermel*, 369 S.W.2d at 922.  "No two cases involving undue influence are alike." *Id.* at 921.  As stated in *Rothermel*,

> The exertion of influence that was or became undue is usually a subtle thing and by its very nature usually involves an extended course of dealings and circumstances.  Thus, it is settled that the elements establishing undue influence may be proved by what is known as circumstantial, as well as by direct, evidence. In the absence of direct evidence[,] all of the circumstances shown or established by the evidence should be considered; and even though none of the circumstances standing alone would be sufficient to show the elements of undue influence, if when considered together they produce a reasonable belief that an influence was exerted that subverted or overpowered the mind of the testator and resulted in the execution of the testament in controversy, the evidence is sufficient to sustain such conclusion.  However, the circumstances relied on as establishing the elements of undue influence must be of a reasonably satisfactory and convincing

---

[15]From 1981 to the time of his expert report, Wachtel maintained a private practice specializing in:

- Individual, Couples/Marital and Family Psychotherapy
- Forensic Psychology: Child Custody Evaluations, Parental Alienation, Certified Family and General Mediation and Collaborative Law, Civil and Criminal Expert Witness Services
- Compulsive and Addictive Disorders
- ADHA, Learning Disabilities, Developmental Disorders
- Psychological Consultation and Evaluations.

[16]Wachtel testified that he also had no evidence that James unduly influenced Fisher to change the life insurance or bank account designations.

13

character, and they must not be equally consistent with the absence of the exercise of such influence. This is so because a solemn testament executed under the formalities required by law by one mentally capable of executing it should not be set aside on a bare suspicion of wrongdoing.

*Id.* at 922–23 (citations omitted).

Sheila and Carlos argue that James had the opportunity to influence Fisher because he "isolate[ed] . . . Fisher for 30 days after the death of his wife" and called him daily. "The exertion of undue influence cannot be inferred by opportunity alone." *In re Estate of Ross*, No. 10-10-00189-CV, 2011 WL 6004336, at *6 (Tex. App.—Waco Nov. 30, 2011, no pet.) (mem. op.) (citing *Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas, pet. denied)). Thus, evidence that James called Fisher every day after Audrey's death, took him to New Hampshire, and visited him before his death is no evidence of the existence and exertion of undue influence because such contacts are "equally consistent with the theory of innocence as . . . with the theory of wrongdoing." *Id.* (quoting *Rothermel*, 369 S.W.2d at 923); *see Mackie*, 900 S.W.2d at 450. Likewise, evidence showing that Fisher was old, suffered from the common maladies of age, and demonstrated some mental impairment demonstrates opportunity to exert influence, but does not show that his mind was subverted or overpowered by James at the time that he executed the 2011 will.[17] *See Davis*, 9 S.W.3d at 293; *Guthrie v. Suiter*, 934 S.W.2d 820, 832 (Tex. App.—Houston [1st Dist.] 1996, no writ).

The more important inquiry is whether James took advantage of opportunities to unduly influence Fisher. Chester claimed that, after Audrey's death, James warned that Jacqueline

---

[17]Sheila and Carlos do not claim that Fisher lacked testamentary capacity to enter his will.

14

would not be handling Fisher's accounting in the near future. According to Carlos, Fisher complained to Jacqueline about James' repeated telephone calls and his requests for paperwork related to Audrey's will and life insurance policies. While Jacqueline was alive, Fisher listed James as co-owner of both a newly created checking account and a bank safety deposit box. Sheila testified that Fisher told Chester about James' co-ownership, which angered Jacqueline and prompted her to first talk to Fisher and then to James about the reason for Fisher's decision to list James as the co-owner instead of her. According to Chester, Jacqueline became angry and suggested that the name change was not appropriate because Fisher was her father, to which James replied, "It doesn't matter who you are, I can make him do things you can't," a statement which Sheila and Carlos characterize as "a direct admission by [James] of his ability to control Fisher."

In a telephone conversation overheard by Carlos, James asked Fisher if anything needed to be done about the will since Jacqueline had died, and Fisher replied, "[N]o, there's no reason. Everything is going to my grandkids." Yet, in March 2011, Chester claimed that Fisher told him, "[James] is pushing me to change the will; he's pushing me to do something I don't want to do." Wachtel's report and testimony concluded that Fisher "was extremely vulnerable and highly susceptible to undue influence, including having his mind and judgment easily subverted and overpowered (particularly by his nephew, [James], to whom Mr. Fisher would respond as a military superior)."

There is evidence showing that James had some influence over Fisher. However, "[i]t cannot be said that every influence exerted by one person on the will of another is undue, for the

15

influence is not undue unless the free agency of the testator was destroyed and a testament produced that expresses the will on the one exerting the influence." *Rothermel*, 369 S.W.2d at 922. While Chester claimed that, according to Fisher, James was pushing Fisher to change the will and do something he did not want to do, there is no evidence that James was pushing Fisher to name him executor of the will and leave the residue of the estate to him or that James misrepresented, deceived, or tricked Fisher in any way with respect to the 2011 will. *See Steed*, 152 S.W.3d at 809 (discussing what constitutes evidence of fraudulent motive to support claim of undue influence). In fact, "one may request or even importune and entreat another to execute a favorable dispositive instrument; but unless the importunities and entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument with undue influence." *Rothermel*, 369 S.W.2d at 922.

Undue influence "must be proved to have been exercised in relation to the . . . will itself and not merely in other transactions. Mere persuasions, entreaties, or mere suspicion of undue influence will not invalidate . . . a will on such grounds." *Griffin v. Griffin*, 271 S.W.2d 714, 719 (Tex. Civ. App.—Texarkana 1954, no writ); *see In re Estate of Graham*, 69 S.W.3d 598, 610 (Tex. App.—Corpus Christi 2001, no pet.). Thus, evidence that another influenced a testator, by "dominat[ing] him, including handling all [of the testator's] financial affairs, being the 'boss,' and running the whole show" is legally insufficient to invalidate a will in the absence of evidence that undue influence "was specifically exerted on the testamentary act." *Steed*, 152 S.W.3d 809 (citing *Griffin*, 271 S.W.2d 714).

16

In order to defeat James' no-evidence summary judgment motion, Sheila and Carlos were required to introduce evidence showing that James' undue influence subverted or overpowered the mind of the testator *at the time of execution of the instrument*. *Steed*, 152 S.W.3d at 807 (citing *Rothermel*, 369 S.W.2d at 922). Neither Sheila nor Carlos had any knowledge regarding the specific circumstances surrounding the execution of Fisher's will. Wachtel and Sheila both testified that they had no personal knowledge that James actually unduly influenced Fisher in the making of the 2011 will. Instead, it was uncontested that the will was finally prepared by an attorney, the signature on the will belonged to Fisher, the will was witnessed by neutral third parties, and James was in New Hampshire during the time that the will was executed. Here, aside from speculation, James' testimony that he did not draft the 2011 will and did not have prior knowledge of its terms also remained uncontested.

Also, Sheila and Carlos were required to show that Fisher executed a will that he would not have executed but for the influence exerted on him. *Id.* The establishment of this element of undue influence "is generally predicated on an assessment of whether the testament provides for an unnatural disposition of the property." *Davis*, 9 S.W.3d at 294. The 2011 will left specific bequests to Sheila, Carlos, and several other people affiliated with Fisher. It is not unnatural, for purposes of determining whether a will was executed because of undue influence, when a testator "make[s] one relative a larger bequest than another."[18] *Steed*, 152 S.W.3d at 812.

---

[18]During a telephone conversation overheard by Carlos in 2010 after Audrey's death, Fisher stated that he did not need to alter his testamentary disposition because "[e]verything is going to my grandkids." Carlos testified that, during the overheard telephone call, James did not suggest to Fisher that he should be included in the will. Fisher's statement was made well before he executed the 2011 will. "Only where all reasonable explanation for the devise is lacking may the trier of facts consider the disposition as evidence of disorder or lapsed mentality." *Davis*, 9 S.W.3d at 294. Sheila and Carlos did not take care of Fisher after Audrey's death. Carlos was physically absent, and Sheila

"When circumstantial evidence is so slight that the choice between opposing plausible inferences amounts to nothing more than speculation, it is legally no evidence at all." *Muela v. Gomez*, 343 S.W.3d 491, 496 (Tex. App.—El Paso 2011, no pet.) (citing *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001)). We conclude that Sheila and Carlos's evidence, even when viewed in a light most favorable to them, amounted to no more than a scintilla of evidence that James exerted undue influence which caused Fisher to execute the 2011 will. *See Estate of Graham*, 69 S.W.3d at 610–11. Because the will "executed under the formalities required by law by one mentally capable of executing it should not be set aside on a bare suspicion of wrongdoing," the trial court's decisions to grant James' no-evidence summary judgment motion, admit the 2011 will to probate, and issue letters testamentary were proper. *Mackie*, 900 S.W.3d 445 (citing *Rothermel*, 369 S.W.3d at 923).

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:    July 21, 2014
Date Decided:    October 29, 2014

---

visited Fisher every other weekend at most. However, James called and spoke with Fisher every day, and there is evidence that James paid the Crowleys to provide care to Fisher. Thus, there is a reasonable explanation for the devise.

18